**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: November 6 2017**

_John P. Gustafson_
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 17-30226 |
| | ) | |
| Melissa A. Arndt | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | JUDGE JOHN P. GUSTAFSON |

### MEMORANDUM OF DECISION RE UNITED STATES TRUSTEE'S MOTION TO DISMISS CHAPTER 7 CASE FOR ABUSE UNDER SECTION 707(b)

This case comes before the court on the Motion of the United States Trustee ("the UST") to Dismiss for Abuse Pursuant to 11 U.S.C. Section 707(b)(1), (b)(2), and (b)(3) ("Motion") [Doc. #19]. Debtor Melissa A. Arndt ("Debtor") filed a Response and Request for Hearing ("Response") [Doc. #26]. Debtor's Response was filed by attorney John A. Brikmanis ("Debtor's Counsel"). An Order for Evidentiary Hearing was entered on May 8, 2017, setting a trial date of July 18, 2017. [Doc. #21].

The court held an evidentiary hearing on the Motion that Debtor, Debtor's Counsel, and Counsel for the UST attended in person. At the hearing, the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. §1334(a) as a case under Title 11. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1939, 191 L.Ed.2d

911, 918 (2015); *Harper v. The Oversight Comm. (In re Conco)*, 855 F.3d 703, 709 (6th Cir. 2017); *In re Norenberg*, 554 B.R. 480, 483 (Bankr. D. Mont. 2016). It has been referred to this court by the district court under its general order of reference. 28 U.S.C. §157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss under §707(b) are core proceedings that this court may hear and decide. 28 U.S.C. §157(b)(1), (b)(2)(J) and (O); *In re Norenberg*, 554 B.R. at 482; *In re Floyd*, 534 B.R. 729, 731 (Bankr. N.D. Ohio 2015); *In re Rooney*, 436 B.R. 454, 455 (Bankr. N.D. Ohio 2010).

Having considered the motion, the response and arguments of counsel, and having reviewed the record in this case, for the reasons that follow the court will grant the UST's motion and dismiss the Debtor's Chapter 7 case unless the Debtor elects to convert the case to a proceeding under Chapter 13.

## BACKGROUND

Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on January 31, 2017, stating that her debts were primarily consumer debts. [Doc. #1, p. 6, Part 6, Q. 16a; p. 8, Part 4, Q. 7]. Debtor's Schedule D shows total secured debt in the amount of $282,249.07. [Doc. #1, p. 19]. Debtor's secured debt total includes $213,243.00 secured by residential real estate in Elmore, Ohio, which was valued at $226,000.00 on Schedule D. [Doc. #1, p. 18]. A 2015 Chevrolet Silverado, valued at $35,302.00, was listed as serving as collateral for a loan of $47,106.07. [Doc. #1, p. 19]. Two recreational vehicles were listed, a 2015 Polaris Assault snowmobile, subject to a secured debt of $12,900.00, and a 2015 Polaris Sportsman 850 SP ATV, subject to a secured debt of $9,000. [Doc. #1, pp. 18-19].

Debtor stated her intention to reaffirm the debt on a 2015 Chevrolet Silverado pick up truck [Doc. #1, p. 38]. A reaffirmation agreement on that motor vehicle does not appear to have been filed yet. The Statement of Intention reflects that the other property that serves as collateral is being surrendered, including: 1) Debtor's former residence in Elmore, Ohio; 2) the 2015 Polaris 800 Assault Snowmobile; and, 3) the 2015 Polaris Sportsman 850 SP ATV. [Doc. #1, p. 37].

Debtor's bankruptcy schedules reflect unsecured priority debt in the amount of $0. [Doc. #1, p. 8, Part 2: Q. 3 & pp. 20-22]. Debtor's schedules show unsecured nonpriority debts in the amount of $21,025.35 [Doc. #1, p. 8, Part 2: Q. 3; pp. 20-22]. The non-priority unsecured debt may be increased by deficiency claims after the liquidation of the surrendered secured property - the Elmore

2

residence and the two recreational vehicles.

Debtor is a pipe fitter, and a union member working for a large corporate employer. She testified that her financial difficulties started when she was demoted from a higher paying position with supervisory duties in April of 2016. She had a reduction in pay of approximately $10 per hour, she lost the use of a company vehicle and a company cell phone, and her opportunities for overtime were reduced. Because of the corresponding reduction in pay, her recently purchased home became unaffordable, and she moved in with her mother. Debtor filed her Chapter 7 bankruptcy on January 31, 2017.

Debtor testified that after filing, local work for her employer dried up. To avoid having to take unemployment, Debtor took an offer to work in North Carolina for her same employer.

For the type of job Debtor does, her employer does not provide reimbursement for expenses, such as lodging and transportation. Thus, Debtor had additional expenses, such as driving to and from the out-of-state worksite, and the expense of maintaining a separate place to stay. On the other side of the ledger, Debtor's income was substantially increased during her time in North Carolina.

One week before the hearing on the U.S. Trustee's Section 707(b) Motion, the out-of-town assignment ended. As of the date of the Hearing, Debtor had been out of work approximately a week and testified that she was pessimistic about the hours she would receive in the future.

Much of the testimony presented by the UST was about the expenses incurred by the Debtor while she worked in North Carolina. Debtor's attorney argued that receipts showed that there was no excess income based on receipts from the trip that had been provided to the UST. The Debtor's expenses reflected a mixture of frugality and indulgence. Food expenses were very high (even crediting that the meal receipts often were actually for two meals - one eaten there, and one "to go" for the next day), and the U.S. Trustee asserted that the amount spent on golf would be sufficient to fund a Chapter 13 Plan. On the other hand, Debtor testified about how she had saved money by renting a trailer for much less than it would have cost to stay in a hotel.

There was no dispute that Debtor's Statement of Intention states that the home that she had purchased before her job demotion was being surrendered. [Doc. #1, p. 18]. The arrangement with her mother was for rent of $300 per month, plus an additional $200 per month for the propane used for heat, and about $100 a month for her share of the electric bill. Debtor is also surrendering the ATV and snowmobile that were subject to security interests. The contractually due monthly

3

payments for those two recreational vehicles are included as deductions, along with the house payment, on Debtor's Means Test. [Doc. #1, p. 47].

Testimony was presented regarding the necessity of Debtor's diesel pick up truck. The monthly payment for that vehicle is listed as $873 per month. [Pl. Ex. 1, p. 1-28]. It would be a fair characterization of Debtor's testimony to describe the truck's fuel mileage as "poor". Even when Debtor works "locally", she testified that she generally has to drive about an hour to an hour and a half to her job sites. Although it is not part of the Line 39 "monthly disposable income" Means Test calculation, Debtor lists $1,028 for "Vehicle operating expenses" under "Special Circumstances"[1] in Part 4 of her Means Test. [Pl. Ex. 1, p. 1-49]. While the truck is expensive, the testimony of the Debtor regarding its necessity was credible. As a pipe fitter, Debtor is required to carry her equipment with her to her job sites. That equipment includes welding equipment, which is heavy and would not fit in a car.

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. §707(b)(1). Under §707(b)(2) and (3), Congress provided two methods by which a party may prove abuse.

Section 707(b)(2)(A) sets forth an extensive "Means Test" calculation to determine whether there is a presumption of abuse. The Means Test calculation permits a debtor to subtract certain allowed deductions from the debtor's "current monthly income". Where the Means Test calculation results in sufficient disposable income such that a presumption of an abusive filing arises, a debtor may rebut that presumption by demonstrating "special circumstances" as set forth in §707(b)(2)(B). Whether the presumption does not arise, or arises and is rebutted, the court may still dismiss a case for abuse under §707(b)(3).

Under §707(b)(3), in determining whether granting relief would be an abuse, the court is

---

[1] The $1,028 figure in Part 4 is not particularly credible, particularly if it is viewed as an additional $1,028 on top of the vehicle operating expense. [Pl. Ex. 1, p. 1-43, Line 12]. The number is contradicted by the amount of $800 - total - listed on Schedule J, line 12, for "Transportation. Include gas, maintenance, bus or train fare. Do not include car payment". [Pl. Ex. 1, p. 1-28]. Moreover, Debtor's counsel also included under "Special Circumstances" an expense of $625 for "Home Repair". With the real estate being surrendered, the inclusion of very high repair costs makes it difficult to view the amounts listed in "Special Circumstances" as being carefully considered additions intended to assist the court in understanding the reality of the Debtor's situation.

4

required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). These provisions were added as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under §707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in §707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under §707(b)(3), Congress lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *McGowan v. McDermott*, 445 B.R. 821, 824 n.5 (N.D. Ohio 2011); *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007). Also removed from §707(b) by the BAPCPA was the "presumption in favor of granting the relief requested by the debtor". *See*, *In re Witcher*, 702 F.3d 619, 622 (11th Cir. 2012); *In re Srikantia*, 417 B.R. 505, 508 (Bankr. N.D. Ohio 2009); *In re Mestemaker*, 359 B.R. 849, 856 (Bankr.N.D.Ohio 2007).

I.      **The Presumption Of Abuse Does Not Arise: In Chapter 7 Cases, §707(b)(2)(iii)(I) Permits The Deduction Of Contractually Due Secured Debt Payments, Even On Property Being Surrendered.**

The court may dismiss a case filed under Chapter 7, where the debts are "primarily consumer debts", if the court "finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. §707(b). In Chapter 7 cases, the Means Test is "used as a screening mechanism to determine whether a Chapter 7 proceeding is appropriate." *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 65, n.1, 131 S.Ct. 716, 721 n.1, 178 L.Ed.2d 603 (2011). Pursuant to §707(b)(2), a bankruptcy court "shall presume abuse exists if the debtor's current monthly income reduced by" certain allowable expenses is greater than the threshold amounts in subsections §707(b)(2)(A)(i)(I) or §707(b)(2)(A)(i)(II).

This statutory formula for calculating whether the presumption of abuse arises in Chapter 7 is implemented through an Official Form commonly called the "Means Test". *See*, Official Forms 122A-1 and 122A-2 [Pl. Ex. 1, pp. 1-39 - 1-49].

5

The UST argues that the court should hold that the presumption of abuse arises in this case because the Debtor will be surrendering her residence, and therefore will no longer have the expense of making the monthly mortgage payment of approximately $1,475. [Doc. #1, p. 37]. Because the Debtor will not be paying that monthly mortgage payment, the UST asserts that "monthly disposable income" on Line 39d of the Means Test should be recalculated without that payment, resulting in the presumption of abuse arising under §707(b)(2). Similarly, a snowmobile and ATV are listed as being surrendered, and the UST asserts their monthly payments should not be allowed. [Doc. #1, p. 37].

The method of calculating allowable monthly expenses for secured debts is set forth in §707(b)(2)(A)(iii)[2]:

> (iii)    The debtor's average monthly payments on account of secured debts shall be calculated as the sum of —
>
> (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; . . . .

This provision applies in Chapter 7 cases - not just for the common sense reason that §707(b)(2)(A)(iii)(I) is part of Chapter 7, but also because the Code says it applies: "Subchapters I and II of chapter 7 of this title apply only in a case under such chapter." *See*, §103(b)[3]; *In re Husman*, 276 B.R. 596, 598 (Bankr. N.D. Ill. 2002). Section 707 is part of "Subchapter I" of Chapter 7.

The UST cites to cases supporting the minority view that debtors may not deduct secured debt obligations that are contractually due on the date of the filing if the debtor is surrendering the underlying collateral. Cases supporting that view include: *In re Campbell*, 2016 WL 4150663, 2016 Bankr. LEXIS 2804 (Bankr. E.D. Va. Aug. 3, 2016); *In re White*, 512 B.R. 822 (Bankr. N.D. Miss. 2014); *In re Byers*, 501 B.R. 82 (Bankr. E.D.N.C. 2013); *In re Powers*, 534 B.R. 207 (Bankr. N.D. Fla. 2015); *In re Hamilton*, 513 B.R. 292 (Bankr. M.D.N.C. 2014); *In re Sterrenberg*, 471 B.R. 131

---

[2] The amounts deducted under §707(b)(2)(A)(iii)(II) for "cure" were too small to alter the result here.

[3] "Section 103 is the road map for the various chapters and subchapters. It contains 11 paragraphs that explain which chapters and sections apply in which parts of the Code." 2 Collier on Bankruptcy, ¶103.01, at 103-3 (16th ed. 2017).

6

(Bankr. E.D.N.C. 2012); *In re Fredman*, 471 B.R. 540 (Bankr. S.D. Ill. 2012); *In re Krawczyk*, 2012 WL 3069437, 2012 Bankr. LEXIS 3466 (Bankr. E.D.N.C. July 27, 2012); *In re Thompson*, 457 B.R. 872 (Bankr. M.D. Fla. 2011); *In re Leary*, 2008 WL 1782636, 2008 Bankr. LEXIS 1204 (Bankr. S.D. Tex. April 16, 2008); *In re Naut*, 2008 WL 191297, 2008 Bankr. LEXIS 175 (Bankr. E.D. Pa. Jan. 22, 2008); *In re Burden*, 380 B.R. 194 (Bankr. W.D. Mo. 2007); *In re Ray*, 362 B.R. 680 (Bankr. D.S.C. 2007); *In re Harris*, 353 B.R. 304 (Bankr. E.D. Okla. 2006); *In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo. 2006).

The majority view is that Chapter 7 debtors may deduct contractually due secured debt payments under §707(b)(2)(A)(iii)(I). *See, Morse v. Rudler (In re Rudler)*, 576 F.3d 37 (1st Cir. 2009); *Masur v. Fokkena*, 2009 WL 3150891, 2009 U.S. Dist. LEXIS 93343 (D.S.D. Sept. 30, 2009); *Lynch v. Haenke*, 395 B.R. 346 (E.D.N.C. 2008); *Fokkena v. Hartwick*, 373 B.R. 645 (D. Minn. 2007); *In re Lawrence*, 2016 WL 4487628, 2016 Bankr. LEXIS 3124 (Bankr. D. Dist. Col. Aug. 25, 2016); *In re Denzin*, 534 B.R. 883 (Bankr. E.D. Va. 2015)*; In re Navin*, 526 B.R. 81 (Bankr. N.D. Ga. 2015); *In re Johnson*, 503 B.R. 447 (Bankr. N.D. Ind. 2013); *In re Behague*, 497 B.R. 340 (Bankr. M.D. Fla. 2012); *In re Rivers*, 466 B.R. 558 (Bankr. M.D. Fla. 2012); *Walton v. Hardigan (In re Hardigan)*,  2012 WL 9703097, 2012 Bankr. LEXIS 5873 (Bankr. S.D. Ga. Dec. 19, 2012); *In re Sonntag*, 2011 WL 3902999, 2011 Bankr. LEXIS 3304 (Bankr. N.D. W.Va. Sept. 6, 2011); *In re Ng*, 2011 WL 576067, 2011 Bankr. LEXIS 583 (Bankr. D. Hawaii Feb. 9, 2011); *In re Grinkmeyer*, 456 B.R. 385 (Bankr. S.D. Ind. 2011); *In re Prigge*, 441 B.R. 667 (Bankr. D. Mont. 2010); *In re Vecera*, 430 B.R. 840 (Bankr. S.D. Ind. 2010); *In re Steinberg*, 2010 WL 4642059, 2010 Bankr. LEXIS 4001 (Bankr. D. Wyo. Oct. 8, 2010); *In re Brady*, 419 B.R. 479 (Bankr. M.D. Fla. 2009); *In re Perelman*, 419 B.R. 168 (Bankr. E.D.N.Y. 2009); *In re Altman*, 2009 WL 5200522, 2009 Bankr. LEXIS 4185 (Bankr. M.D. Ga. Dec. 22, 2009); *In re Phillips*, 417 B.R. 30 (Bankr. S.D. Ohio 2009); *In re James*, 414 B.R. 901 (Bankr. S.D. Ga. 2008); *In re Crawley*, 412 B.R. 777 (Bankr. E.D. Va. 2009); *In re Stewart*, 410 B.R. 912 (Bankr. D. Or. 2009); *In re Harvey*, 407 B.R. 867 (Bankr. W.D. Va. 2009), *aff'd*, *McDow v. Harvey*, 2010 WL 537872, 2010 U.S. Dist. LEXIS 12579 (W.D. Va. Feb. 12, 2010); *In re Jensen*, 407 B.R. 378 (Bankr. C.D. Cal. 2009); *In re Demesones*, 406 B.R. 711 (Bankr. E.D. Va. 2008); *In re Norwood-Hill*, 403 B.R. 905 (Bankr. M.D. Fla. 2009); *In re Altman*, 2009 WL 5200522, 2009 Bankr. LEXIS 4185 (Bankr. M.D. Ga. Dec. 22, 2009); *In re Cutler*, 2009 WL 2044378, 2009 Bankr. LEXIS 2075 (Bankr. S.D. Ind. July 9, 2009); *In re Goble*,

7

401 B.R. 261 (Bankr. S.D. Ohio 2009); *In re Ralston*, 400 B.R. 854 (Bankr. M.D. Fla. 2009); *In re Willette*, 395 B.R. 308 (Bankr. D. Vt. 2008); *In re Parada*, 391 B.R. 492 (Bankr. S.D. Fla. 2008); *In re Smale*, 390 B.R. 111 (Bankr. D. Del. 2008); *In re Guerriero*, 383 B.R. 841 (Bankr. D. Mass. 2008); *In re Castillo*, 2008 WL 4544467, 2008 Bankr. LEXIS 2740 (Bankr. S.D. Fla. Oct. 10, 2008); *In re Daniels-Brown*, 2008 WL 4379152, 2008 Bankr. LEXIS 4172 (Bankr. D. Md. Sept. 23, 2008); *In re Vandenberg*, 2008 WL 2020186, 2008 Bankr. LEXIS 1406 (Bankr. D. Neb. May 8, 2008); *In re Rodriques*, 2008 WL 372742, 2008 Bankr. LEXIS 335 (Bankr. N.D. Cal. Feb. 11, 2008); *In re Lindstrom*, 381 B.R. 303 (Bankr. D. Colo. 2007); *In re Makres*, 380 B.R. 30 (Bankr. N.D. Okla. 2007); *In re Hayes*, 376 B.R. 55 (Bankr. D. Mass. 2007); *In re Pilarski*, 2007 WL 3452338, 2007 Bankr. LEXIS 3797 (Bankr. D. Minn. Nov. 14, 2007); *In re Chang*, 2007 WL 3034679, 2007 Bankr. LEXIS 3568 (Bankr. N.D. Cal. Oct. 16, 2007); *In re Hansen*, 378 B.R. 329 (Bankr. W.D. Okla. 2007); *In re Maya*, 374 B.R. 750 (Bankr. S.D. Cal. 2007); *In re Osborne*, 374 B.R. 68 (Bankr. W.D.N.Y. 2007); *In re Townsend*, 2007 WL 3244429, 2007 Bankr. LEXIS 3791 (Bankr. N.D. Ohio Oct. 30, 2007); *In re Hummel*, 2007 WL 7142576, 2007 Bankr. LEXIS 3724 (Bankr. N.D. Ga. Oct. 1, 2007); *In re Kelvie*, 372 B.R. 56 (Bankr. D. Idaho 2007); *In re Ellringer*, 370 B.R. 905 (Bankr. D. Minn. 2007); *In re Wilkins*, 370 B.R. 815 (Bankr. C.D. Cal. 2007); *In re Kogler*, 368 B.R. 785 (Bankr. W.D. Wis. 2007); *In re Gaylon*, 366 B.R. 164 (Bankr. W.D. Okla. 2007); *In re Longo*, 364 B.R. 161 (Bankr. D. Conn. 2007); *In re Mundy*, 363 B.R. 407 (Bankr. M.D. Pa. 2007); *In re Graham*, 363 B.R. 844 (Bankr. S.D. Ohio 2007); *In re Palm*, 2007 WL 1772174, 2007 Bankr. LEXIS 2046 (Bankr. D. Kan. June 19, 2007); *In re Doud*, 2007 WL 6374668, 2007 Bankr. LEXIS 4031 (Bankr. N.D. Ohio June 26, 2007)*; In re Augenstein*, 2007 WL 6374910, 2007 Bankr. LEXIS 4033 (Bankr. N.D. Ohio June 14, 2007); *In re Vanhoose*, 2007 WL 6383334, 2007 Bankr. LEXIS 4033 (Bankr. N.D. Ohio May 21, 2007); *In re Zak*, 361 B.R. 481 (Bankr. N.D. Ohio 2007); *In re Haar*, 360 B.R. 759 (Bankr. N.D. Ohio 2007); *In re Hoerlein*, 2007 Bankr. LEXIS 1043 (Bankr. S.D. Ohio April 3, 2007); *In re Vartan*, 2007 WL 640006, 2007 Bankr. LEXIS 4968 (Bankr. E.D. Cal. Feb. 26, 2007); *In re Hartwick*, 359 B.R. 16 (Bankr. D.N.H. 2007); *In re Sorrell*, 359 B.R. 167, 186 (Bankr. S.D. Ohio 2007); *In re Randle*, 358 B.R. 360 (Bankr. N.D. Ill. 2006), aff'd, *Randle v. Neary (In re Randle)*, 2007 WL 2668727, 2007 U.S. Dist. LEXIS 54985 (N.D. Ill. July 20, 2007); *In re Nockerts*, 357 B.R. 497 (Bankr. E.D. Wis. 2006); *In re Simmons*, 357 B.R. 480 (Bankr. N.D. Ohio 2006); *In re Walker*, 2006 WL 1314125, 2006 Bankr. LEXIS 845 (Bankr. N.D. Ga. May 1,

2006); *see also*, 6 Collier on Bankruptcy, ¶707.04[3][c][ii] at 707-38 - 707-39 (16th ed. 2017)("The provision also makes no distinction between payments on property that the debtor intends to retain and property the debtor will surrender; its plain language literally requires that all payments contractually due to secured creditors during the relevant period be deducted.").

Notably, by October 30, 2007, seven bankruptcy judges in the Northern District of Ohio had held that §707(b)(2)(A)(iii)(I) does not impose a limitation on the deduction for secured debt payments based on the debtor's Statement of Intention or on post-petition events, such as the surrender of collateral or the granting of relief from stay. *See*, *In re Townsend*, 2007 WL 3244429 at *2, 2007 Bankr. LEXIS 3791 at *6 (Bankr. N.D. Ohio Oct. 30, 2007)(citing cases).

Under the "plain meaning" rule, the court must interpret the language of §707(b)(2)(A)(iii)(I) "in light of the 'plain meaning' of the words, which the Supreme Court has cautioned 'should be conclusive, except in cases where the literal interpretation produces a result demonstrably at odds with the intention of the drafters.'" *United States v. Ron Pair Enterprises., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004)("It is well-established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.")(internal quotation marks omitted); *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004)("If clear, the plain meaning of the statutory language controls; departure from the plain language of a statute is appropriate only in 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafter . . . or when the statutory language is ambiguous.'").

Thus, if the statutory language is clear, a court's analysis must end there.[4] *Hartford Underwriters Ins. Co. v. Union Planters Bank, Nat'l Ass'n*, 530 U.S. 1, 6 (2000).

The plain language of §707(b)(2)(A)(iii)(I) appears to have a plain meaning. As the *Walker* court stated:

> The use of the phrase "contractually due" also indicates an intent to permit a deduction for all secured debts, regardless of whether . . . the collateral is surrendered. The surrender of the collateral does not change the fact that the payments are "contractually due." When a debtor files the bankruptcy petition, the

_____

[4] As the length of this Opinion shows, this admonition is easier cited than followed when there are cases holding contrary views.

9

debtor is contractually due for payments on the outstanding secured debts for the length of the contract. The debtor's contractual liability for the debt is not eliminated upon the surrender of the collateral. At the earliest, it may be eliminated by the entry of the discharge. At the latest, the contractual obligation may never actually be eliminated, but instead, the creditor would merely be enjoined from collecting the debt from the debtor in personam. In other words, nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due.

\* \* \* \* \* \*

Even if the debtor does surrender the collateral, the surrender of the collateral does not change the fact that the payments are "scheduled as contractually due to a secured creditor." Following the surrender of the collateral, the creditor remains a secured creditor at least until the collateral has been liquidated and the proceeds are applied to satisfy the debt.

*In re Walker*, 2006 WL 1314125 at *4, 2006 Bankr. LEXIS 845 at **12-14 (Bankr. N.D. Ga. May 1, 2006).

In contrast, the *Harris* decision denied a secured debt deduction based, in part, on a rejection of the statement in *Walker* that a debtor's intention to surrender collateral does not change the fact that the payments are "contractually due":

When a debtor surrenders collateral, the debtor is no longer required to make the scheduled installment payments. If there is a deficiency after application of the collateral proceeds to the indebtedness, an unsecured claim remains, but a secured debt no longer exists and no payment is due except for an unsecured deficiency balance.

*In re Harris*, 353 B.R. 304, 309 (Bankr. E.D. Okla. 2006).

To the extent that *Harris* is asserting that checking the box for "surrender" in the Statement of Intention equates to secured debts no longer being "contractually due", it is incorrect. *See*, §521(a)(2)[5] ("except that nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's right with regard to such property under this title, except as provided in section 362(h)"); 4 Collier on Bankruptcy, ¶521.14[4] at 521-48 (16th ed. 2017)("This provision does not affect the debtor's substantive rights vis a vis the creditor...."); *see also*, Collier, ¶521.14[5] ("the primary purpose of section 521(a)(2) is one of notice").

---

[5]/ The quotation is from what appears to be an un-numbered or lettered "hanging clause" after §521(a)(2)(B). Prior to the Technical Corrections Act of 2010, this subsection was designated as §521(a)(2)(C).

10

Further, in the time since *Harris* was decided in 2006, we have learned, sometimes painfully, that "surrender" does not impose an obligation on secured creditors to take any action to liquidate collateral and transmute a secured debt into an unsecured deficiency. First, it is questionable whether "surrender" is to the secured party at all. Section 521(a)(4) suggests that property of the estate is actually surrendered to the trustee, not the secured creditor. If that view is not followed, other courts have held that in the context of §521(a)(2), "surrender" means that the debtor agrees to make the collateral available to the secured creditor. " *See*, *In re Canning*, 706 F.3d 64, 69-70 (1st Cir. 2013). However, the secured creditor "has the prerogative to decide whether to accept or reject the surrendered collateral, since 'nothing in subsection 521(a)(2) remotely suggests that the secured creditor is required to accept possession of the [collateral].'" *Id.* The relative ineffectiveness of "surrender" was both the force behind attempts to allow "forced vesting" in Chapter 13 cases, and the reason most courts have rejected the arguments for forced vesting. *See e.g.*, *In re Brown*, 563 B.R. 451, 456-457 (D. Mass. 2017).

One of the other changes made by BAPCPA also undercuts the idea that monthly secured debt payments must cease after bankruptcy if there is no reaffirmation agreement. Section 524(j) provides that a creditor may contact a debtor about making payments on their principal residence, to seek to obtain "periodic payments associated with a security interest in lieu of pursuit of in rem relief to enforce the lien."

In §707(b)(2)(A)(iii)(I), the terms "scheduled" and "contractually due" are modified by the phrase "in each month of the 60 months following the date of the petition". "This phrase does not require that a debtor actually pay the debt in each of the 60 months postpetition. Rather, when read in context of §707(b)(2), the clause simply operates to define the period over which the debtor's 'contractually due' payments are averaged." *In re Lindstrom*, 381 B.R. 303, 307 (Bankr. D. Colo. 2007). The court finds cases, such as *In re Ray*, 362 B.R. 680, 685 (Bankr. D.S.C. 2007), holding that this language requires a "forward looking" approach, to be unpersuasive.

Instead, the court finds that the statute sets out a mathematical formula, based on what the "contractually due" obligations are as of the date of the petition. The statute requires the debtor to use a method of calculation to determine the debtor's average monthly payment deduction that starts with the total of all amounts contractually due to secured creditors in each month of the 60 months following the petition date, and then divides that amount by 60. Thus, §707(b)(2)(A)(iii)(I) sets

11

forth a methodology for debtors to follow in calculating the amount of secured debt that can be deducted in determining whether or not the threshold amounts under §707(b)(2)(A)(i) have been exceeded, giving rise to the presumption of abuse.

This provision is in furtherance of a mechanical test used as part of the "screening mechanism" for determining whether a presumption of abuse should arise, thereby placing the burden on the debtor to rebut the presumption if they wish to go forward with a bankruptcy case under Chapter 7. In addition to the mathematical Means Test, of which §707(b)(2)(A)(iii)(I) is a part, there is also a separate statutory basis for finding abuse, based upon either filing the petition in bad faith, or that the "totality of the circumstances" of the debtor's financial situation demonstrates abuse. *See*, 11 U.S.C. §707(b)(3).

Interpreting the term "all amounts contractually due" as of the date of the filing of the petition does not appear to involve any inherent ambiguity, requiring the court to go further in interpreting the application of the provision to the Debtor in this case. Despite the fact that the real estate is being surrendered, there had been no foreclosure sale, and as of the filing of the petition the monthly mortgage payments remained contractually due. Similarly, the Debtor's snowmobile and ATV had not been sold, and the secured debts owed on those vehicles remained "contractually due" at the time of filing. Moreover, all the secured debts were scheduled without any notation that they were contingent, unliquidated, or disputed. [Doc. #1, Schedule D, pp. 18-19].

Many other courts have held that the language of §707(b)(2)(A)(iii)(I) is not ambiguous, and has a plain meaning that supports a mechanical application of the provision. *Morse v. Rudler (In re Rudler)*, 576 F.3d 37, 52 (1st Cir. 2009); *In re Lawrence*, 2016 WL 4487628 at *4, 2016 Bankr. LEXIS 3124 at *14 (Bankr. D.D.C. Aug. 25, 2016); *In re Brady*, 419 B.R. 479, 486 (Bankr. M.D. Fla. 2009); *In re Phillips*, 417 B.R. 30, 38 (Bankr. S.D. Ohio 2009); *In re James*, 414 B.R. 901, 911 (Bankr. S.D. Ga. 2008); *In re Altman*, 2009 WL 520052 at *7, 2009 Bankr. LEXIS 4185 at *20 (Bankr. M.D. Ga. Dec. 22, 2009); *In re Stewart*, 410 B.R. 912, 921 (Bankr. D. Or. 2009); *In re Harvey*, 407 B.R. 867, 872 (Bankr. W.D. Va. 2009); *In re Norwood-Hill*, 403 B.R. 905, 914 (Bankr. M.D. Fla. 2009); *In re Ralston*, 400 B.R. 854, 861 (Bankr. M.D. Fla. 2009); *In re Daniels-Brown*, 2008 WL 4379152 at *2, 2008 Bankr. LEXIS 4172 at *10 (Bankr. D. Md. Sept. 23, 2008); *In re Parada*, 391 B.R. 492, 498 (Bankr. S.D. Fla. 2008); *In re Lindstrom*, 381 B.R. 303, 307 (Bankr. D. Colo. 2007); *In re Makres*, 380 B.R. 30, 36 (Bankr. N.D. Okla. 2007); *In re Hayes*, 376 B.R. 55, 63

(Bankr. D. Mass. 2007); *Fokkena v. Hartwick*, 373 B.R. 645, 654 (D. Minn. 2007); *In re Randle*, 2007 WL 2668727 at *7, 2007 U.S. Dist. LEXIS 54985 at **19-20 (N.D. Ill. July 20, 2007); *In re Wilkins*, 370 B.R. 815, 819 (Bankr. CD. Cal. 2007); *In re Kogler*, 368 B.R. 785, 790 (Bankr. W.D. Wis. 2007); *In re Gaylon*, 366 B.R. 164, 170 (Bankr. W.D. Okla. 2007); *In re Mundy*, 363 B.R. 407, 414 (Bankr. M.D. Pa. 2007); *In re Palm*, 2007 WL 1772174 at *3, 2007 Bankr. LEXIS 2046 at *7 (Bankr. D. Kan. June 19, 2007); *In re Vanhoose*, 2007 WL 6383334 at *7, 2007 Bankr. LEXIS 4032 at *19 (Bankr. N.D. Ohio May 21, 2007); *In re Sorrell*, 359 B.R. 167, 186 (Bankr. S.D. Ohio 2007); *In re Nockerts*, 357 B.R. 497, 500 (Bankr. E.D. Wis. 2006); *In re Simmons*, 357 BR 480, 485 (Bankr. N.D. Ohio 2006); *In re Walker*, 2006 WL 1314125 at *4, 2006 Bankr. LEXIS 845 at *10 (Bankr. N.D. Ga. May 1, 2006).

This court agrees with the majority view. Accordingly, based upon the "plain meaning" of §707(b)(2)(A)(iii)(I), the court finds that[6] the debtor's current monthly income, reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 has not been shown to be greater than the statutory dollar limits set forth in §707(b)(2)(A)(i).

A.    **Cases Holding That A Forward Looking Approach Applies In Chapter 7 Based On *Lanning* Do Not Address The Statutory Provision That Directs How Courts Are To Interpret The Bankruptcy Code.**

Arguments based upon the Supreme Court's holding in *Lanning* are not persuasive because they require courts to read §1325(b)(3), and the phrase "projected disposable income" into §707(b)(2)(A)(iii)(I). This appears to be statutorily prohibited.

Section 103(i) states:

**§103 Applicability of chapters**

\* \* \* \* \* \* \*

(i) Chapter 13 of this title applies only in a case under such chapter.

As several cases point out, the term "projected disposable income" does not appear in §707. *See*, *In re Denzin*, 534 B.R. 883, 887 (Bankr. E.D. Va. 2015)("There is no language in § 707(b) that

---

[6]/ Based on the limited evidence at the Hearing on Debtor's actual pre-Petition income presented by the UST. Specifically, while there was evidence that income was understated, there was no expert testimony, and thus no testimony regarding how the increase in income would increase expenses, particularly income taxes.

13

is forward-looking as there is in § 1325(b) ('*projected* disposable income').")(emphasis in original); *In re Lawrence*, 2016 WL 4487628 at *4, 2016 Bankr. LEXIS 3124 at *12 (Bankr. D. Dist. Col. Aug. 25, 2016)("'Projected disposable income' does not appear in § 707(b)(2) but in § 1325(b)."); *In re Hardigan*, 2012 WL 9703097 at *3, 2012 Bankr. LEXIS 5873 at *7-*8 (Bankr. S.D. Ga. Dec. 19, 2012)("Notably, both *Lanning* and *Ransom* involved the interpretation of projected disposable income. No phrase similar to "projected disposable income" is present in §707(b)(2).")(footnote omitted); *In re Sonntag*, 2011 WL 3902999 at *3, 2011 Bankr. LEXIS 3304 at *9 (Bankr. N.D. W.Va. Sept. 6, 2011)("no phrase similar to "projected disposable income" is present in §707(b)(2)."); *In re Ng*, 2011 WL 576067 at *2, 2011 Bankr. LEXIS 583 at *5 (Bankr. D. Hawai'i Feb. 9, 2011)("The first crucial difference is that section 1325(b) speaks of the debtor's "projected disposable income," while section 707(b) does not.").

"Disposable income" is a term that was added to Chapter 13 in the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"). *See*, *Baud v. Carroll*, 634 F.3d 327, 341 (6th Cir. 2011). In 2005, the BAPCPA added a definition of "disposable income" in §1325(b)(2).

In contrast, the term "disposable income" - even standing alone without the word "projected" - does not appear anywhere in 11 U.S.C. §707. Section 707(b) speaks in terms of "current monthly income", "current income", "adjustment of income", "adjustment to income" and "median family income" - but the phrase "disposable income" does not appear in Section 707.

Thus, without specific language pulling a Chapter 13 concept into Chapter 7, there is no mechanism by which Section 1325(b)(1) can be imported into the Chapter 7 Means Test. *See*, *Harris v. Viegelahn*, ___ U.S. ___, 135 S.Ct. 1829, 1838, 191 L.Ed.2d 783 (2015)("When a debtor exercises his statutory right to convert, the case is placed under Chapter 7's governance, and no Chapter 13 provision holds sway. § 103(i) ('Chapter 13 ... applies only in a case under [that] chapter.').")

Put another way, in interpreting the Chapter 7 Means Test, the court should follow the directions of Section 103, and focus on the 'general provisions'[7] found in Chapters 1, 3 and 5, and the language of Chapter 7, Subchapter I and II. *See*, 11 U.S.C. §103(a) & (b); 2 Collier on Bankruptcy, ¶103.01, at 103-3 (16th ed. 2017); *and cf.*, *In re Barnet*, 737 F.3d 238, 247 (2nd Cir.

---

[7]/ *In re Husman*, 276 B.R. 596, 598 (Bankr. N.D. Ill. 2002)("pursuant to § 103(a), with certain exceptions, Chapters 1, 3, and 5 of the Bankruptcy Code apply to all cases under Chapter 7, 11, 12, or 13.").

2013)(reference to Section 103 is part of the "straightforward nature of our statutory interpretation"). Based on the explicit statutory directions of Congress in §103(a) and (b), the language in Chapters 1, 3, 5 and 7 are the statutory provisions that are directly applicable in interpreting §707(b) in Chapter 7 cases.

In deciding that the Chapter 13 Means Test was "forward looking", the specific language found in §1325(b)(1)(B) was critical to the Supreme Court's decision in *Hamilton v. Lanning*, 560 U.S. 505, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010). The Supreme Court focused on the adjective modifying "disposable income" - the word "projected". *See*, *In re Denzin*, 534 B.R. 883, 885 (Bankr. Bankr. E.D. Va. 2015). In *Lanning*, the first basis for finding in favor of the forward looking approach was the ordinary meaning of the term "projected". *Hamilton v. Lanning*, 560 U.S. at 513-514, 130 S.Ct. at 2471-2472, 177 L.Ed.2d at 33 (2010). The second reason discussed was that (based upon an examination of the use of the word "projected" in other federal statutes) Congress rarely uses the term "projected" to mean simple multiplication. *Hamilton v. Lanning*, 560 U.S. at 514-515, 130 S.Ct. at 2472, 177 L.Ed.2d at 33-34 (2010). While the third argument is based on pre-BAPCPA practices[8], the majority goes right back to focusing on three additional reasons why the "mechanical approach also clashes repeatedly with the terms of 11 U.S.C, § 1325.":

> First, §1325(b)(1)(B)'s reference to projected disposable income "to be received in the applicable commitment period" strongly favors the forward-looking approach.

> \* \* \* \* \* \* \*

> Second, §1325(b)(1) directs courts to determine projected disposable income "as of the effective date of the plan," which is the date on which the plan is confirmed and becomes binding, see §1327(a).

> \* \* \* \* \* \* \*

> Third, the requirement that projected disposable income "will be applied to make payments" is most naturally read to contemplate that the debtor will actually pay creditors in the calculated monthly amounts. § 1325(b)(1)(B). But when, as of

---

[8]/ *Hamilton v. Lanning*, 560 U.S. at 515-517, 130 S.Ct. at 2472-2474, 177 L.Ed.2d at 34-35 (2010).

15

the effective date of a plan, the debtor lacks the means to do so, this language is rendered a hollow command.

*Hamilton v. Lanning*, 560 U.S. at 514-515, 130 S.Ct. at 2472, 177 L.Ed.2d at 33-34 (2010).

The emphasis on the word "projected" in the phrase "projected disposable income", in combination with the specific statutory direction of Congress in 11 U.S.C. Section 103(i) that Chapter 13 "applies only in a case under such chapter", appears to weigh against adoption of a "forward looking approach" to §707(b)(2)(A)(iii)(I) based on the logic of the decision in *Lanning*. *See also*, *In re Lawrence*, 2016 WL 4487628 at *5, 2016 Bankr. LEXIS 3124 at *16 (Bankr. D. Dist. Col. Aug. 25, 2016)("no argument can be plausibly made that the applicable provision, §707(b)(2)(A)(iii)(I), hauls in 'projected disposable income' concepts that apply to confirmation of a chapter 13 plan.").

The other side of the coin is just as important: the *Lanning* decision does not cite any portion of §707(b) as supporting the forward-looking approach. The words "projected" and "disposable income" do not appear in §707(b), and "the chapter 7 means test does not contain any forward-looking language." *In re Lawrence*, 2016 WL 4487628 at *3, 2016 Bankr. LEXIS 3124 at *11 (Bankr. D. D.C. Aug. 25, 2016); *see also*, *In re Rudler*, 576 F.3d 37, 48-49 (1st Cir. 2009)("that interpretation is not supported by the words themselves, which are forward-looking only in the sense that the required *current* calculation is for debts that are scheduled into the future."); *contra*, *In re White*, 512 B.R. 822, 827-828 (Bankr. N.D. Miss. 2014).

In a subsequent decision, the Supreme Court noted that "Chapter 13 borrows the means test from Chapter 7". *See*, *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 65 n.1, 131 S.Ct. 716, 721 n.1, 178 L.Ed.2d 603(2011). However, Chapter 13 does that "borrowing" through the langauge of §1325(b)(3) clearly stating that "[a]mounts reasonably necessary to be expended . . . shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)" if the debtor is above the median income level. Section 707 does not have language that would bring "disposable income" or "projected disposable income" into the Chapter 7 Means Test.

The provisions of Section 103 also contradict decisions that appear to rely, at least in part, on the idea that there is a policy supporting the concept that Chapter 7 and Chapter 13 should, somehow, be reconciled. In *Fredman*, the court stated: "this Bankruptcy Court can find no basis for defining the phrase one way when it is incorporated by reference into chapter 13 means testing, 11

16

U.S.C. §1325(b)(3), and a different way when it is applied in chapter 7 means testing." *In re Fredman*, 471 B.R. 540, 551-552 (Bankr. S.D. Ill. 2012).

To the extent that the "phrase" is the language of §707(b)(2)(A)(iii)(I), it is being used for two different purposes in the two different Chapters, one being the calculation of "projected disposable income" for purposes of Chapter 13, and the other being the calculation of whether the presumption of abuse arises under §707(b)(2)(A)(iii)(I) in Chapter 7 cases.

Concerns about different definitions of the "same phrase" cannot be referring to "disposable income". As the *Denzin* court stated: "The same phrase, 'disposable income,' is not read differently in § 707 and § 1325. In § 1325(b)(1)(B), the phrase has a modifier—the word "projected"—that is not present in § 707(b)." *In re Denzin*, 534 B.R. 883, 887 (Bankr. E.D. Va. 2015). Again, while the word "projected" is absent from §707(b), "disposable income" is also not found in §707. Where that phrase is found is in the language of Official Form 122A-2, which labels the calculation of whether the threshold under 707(b)(2)(A)(i) is met as "monthly disposable income". *See*, Official Form 122A-2, Part 3, Line 39. But, as we know, when an Official Bankruptcy Form conflicts with the Code, the Code always wins. *See*, *In re Arnold*, 376 B.R. 652, 653 (Bankr. M.D. Tenn. 2007); *In re Wiegand*, 386 B.R. 238, 241 (9th Cir. BAP 2008).

Rather than there being a policy supporting "sameness" between the Chapters of the Bankruptcy Code, the guide to interpreting the Title 11 requires a compartmentalization of the language of Chapter 13 and Subchapters I and II of Chapter 7. *See*, 11 U.S.C. §103(b) & (i). This same type of "separateness" between the various "filing chapters" is further illustrated by the very different definitions of the same term - "disposable income"- in Chapter 13 and Chapter 12. The terms "projected disposable income" in both §1325(b)(1)(B) and §1225(b)(1)(B) pre-date the BAPCPA, and therefore the Means Test. *See*, *In re Slusher*, 359 B.R. 290, 295 (Bankr. D. Nev. 2007). However, as previously discussed, the BAPCPA added a new definition of the term "disposable income" in §1325(b)(2). In contrast, the definition of "disposable income" found in §1225(b)(2) received only a relatively minor change in the BAPCPA - basically it remained the old "reasonably necessary" test, with one addition: the phrase "or for a domestic support obligation that first becomes payable after the date of the filing of the petition". This means there are two very different Bankruptcy Code definitions of "disposable income" in the two most closely related Bankruptcy Code Chapters - with one definition for Chapter 13 and one for Chapter 12. Because

17

of the different definitions of "disposable income", while there are Official Forms for the Chapter 7, 11 and 13 Means Tests, there is no Official Form for a Chapter 12 Means Test because §1225(b)(2)'s definition of "disposable income" provides no statutory basis for Means Testing. *See*, http://www.uscourts.gov/forms/means-test-forms .

The Supreme Court, in *Lanning*, considered a third use of the term "disposable income" in §1129(a)(15)(B), which applies in individual Chapter 11 cases. *See*, *Lanning*, 560 U.S. at 520, 130 S.Ct. at 2475. The subsection incorporates the definition of "the projected disposable income of the debtor (as defined in section 1325(b)(2))". The Chapter 13 Trustee argued that the reference to §1325(b)(2) - where the definition of "disposable income" appears - rather than §1325(b)(1)(B) where "projected disposable income" is found, demonstrated that Congress did not intend to allow the forward-looking approach. The argument was, that for individual Chapter 11 debtors, "projected disposable income" was defined by reference to the definition of "disposable income" in Chapter 13, therefore "projected disposable income" and "disposable income" were the same. The *Lanning* court rejected this argument, stating: "We fail to see how that word acquires a specialized meaning as a result of this cross-reference—particularly where both §§ 1129(a)(15)(B) and 1325(b)(1)(B) refer to projected disposable income 'to be received' during the relevant period." *Id*. The Supreme Court's dismissal of cross-references between filing Chapters changing the meaning of the language referenced appears to be an equally valid response to cases holding that §1325's reference to §707(b)(2) changes its meaning.

The *Lanning* court specifically endorsed a sequence of how §1325(b) was to operate:

> As the Tenth Circuit recognized in this case, a court taking the forward-looking approach should begin by calculating disposable income, and in most cases, nothing more is required. It is only in unusual cases that a court may go further and take into account other known or virtually certain information about the debtor's future income or expenses.

*Lanning*, 560 U.S. at 519, 130 S.Ct. at 2475.

Thus, *Lanning* is describing a two step process. First, calculating disposable income using a mechanical approach. It is important to remember that both parties in *Lanning* agreed that the mechanical approach should be used first:

> Petitioner, advocating the mechanical approach, contends that "projected disposable income" means past average monthly disposable income multiplied by the number

18

of months in a debtor's plan. Respondent, who favors the forward-looking approach, agrees that the method outlined by petitioner should be determinative in most cases, but she argues that in exceptional cases, where significant changes in a debtor's financial circumstances are known or virtually certain, a bankruptcy court has discretion to make an appropriate adjustment.

*Lanning*, 560 U.S. at 513, 130 S.Ct. at 2471.

The second step - the "appropriate adjustment" comes from §1325(b)(1)(B). In §707(b)(2), there is no general statutory provision authorizing this second step, and there is no language §707(b)(2)(A)(iii)(I) that authorizes a forward-looking approach to that subsection.

Thus, the court is also not persuaded by a similar appeal to uniformity based on a statement in Supreme Court's decision in *Caulkett*. The *Campbell* court stated:

> It would be a curious thing to interpret precisely the same words, in the same statute (here, Section 707(b)(2)(A)(iii)) differently, depending on whether the case was filed under Chapter 7 or under Chapter 13. *See Bank of America, N.A. v. Caulkett*, —— U.S. ——, 135 S.Ct. 1995, 2000–01 (2015)(Supreme Court is "generally reluctant to give the 'same words a different meaning' when construing statutes" (*citing Pasquantino v. United States*, 544 U.S. 349, 358 (2005)).

*In re Campbell,* 2016 WL 41550663 at *7, 2016 Bankr. LEXIS 2804 at **18 - 19 (Bankr. E.D. Va. Aug. 3, 2016).

In contrast to the statutory provisions[9] at issue in *Caulkett*, here we are dealing with a statute, §707(b)(2)(A)(iii)(I), that is applied the same way in Chapter 7 and Chapter 13. The difference arises in the second step discussed in *Lanning*, the forward-looking step that is required by the phrase "projected" disposable income in §1325(b)(1)(B), and not required by any language found in §707(b)(2 ). *See also*, *In re Thomas*, 395 B.R. 914, 922 (6th Cir. BAP 2008)(a pre-*Lanning* case

---

[9]/ There is another, structural, difference. *Caulkett* dealt with the application of 11 U.S.C. §506(a) and §506(d), and whether there would be a difference in its application in Chapter 7 and 13. The provision of Chapter 5 of the Bankruptcy Code are applicable to Chapters 7, 12 and 13 under the express direction of §103(a). *See e.g.*, *In re Chavis*, 47 F3d 818, 821 (6th Cir. 1995) ("The filing and allowance of claims is governed by provisions of Chapter 5 of the Bankruptcy Code applicable to all actions filed under Chapters 7, 11, 12 and 13. 11 U.S.C. § 103(a)."); *In re Husman*, 276 B.R. 596, 598 (Bankr. N.D. Ill. 2002)("pursuant to §103(a), with certain exceptions, Chapters 1, 3, and 5 of the Bankruptcy Code apply to all cases under Chapter 7, 11, 12, or 13."). Accordingly, *Caulkett* was a case where §103(a) required the provisions in issue to apply in both Chapter 7 and Chapter 13 cases. It was not a situation where the clear statutory direction of §103(i), stating that provisions of Chapter 13 will apply only in Chapter 13, had to be disregarded to import language into a Section of Chapter 7. A "general reluctance rule" of statutory construction does not overrule the clear statutory directions from Congress stated in 11 U.S.C. §103.

19

holding that a mechanical test was used to determine "disposable income", and then a second step - comparing disposable income and projected disposable income - is required in Chapter 13 cases).

A different "interpretation" of the same statutory language in different Chapters is not the same as the same statute producing different <u>results</u> in different Chapters. Notably, *Caulkett*, in fact, perpetuates[10] a difference, for a very large majority of the country, in a debtor's ability to strip wholly unsecured junior mortgages or deeds of trust based upon whether the case is one proceeding under Chapter 7 or Chapter 13. *See*, *In re Lane*, 280 F.3d 663 (6th Cir. 2002); *In re Tanner*, 217 F.3d 1357 (11th Cir.2000); *In re Dickerson*, 222 F.3d 924 (11th Cir. 2000)(following *Tanner*, somewhat reluctantly); *In re Bartee*, 212 F.3d 277 (5th Cir. 2000); *In re McDonald*, 205 F.3d 606 (3d Cir. 2000); *In re Pond*, 252 F.3d 122 (2nd Cir.2001);*In re Zimmer*, 313 F.3d 1220 (9th Cir. 2003); *In re Davis*, 716 F.3d 331 (4th Cir. 2013); *In re Schmidt*, 765 F.3d 877 (8th Cir. 2014).

Similarly, another Supreme Court decision has recognized the "same statute" leading to a different result in Chapter 7 cases. Based on the specific language of 11 U.S.C. §330(a)(1) and §327, the *Lamie* decision held that - unlike in Chapter 11, 12 and 13 cases - based upon the plain meaning of the statutory provisions, Chapter 7 debtors' attorneys could not be paid from estate funds. *Lamie v. U.S. Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).

Further, the Supreme Court's decision in *Harris v. Viegelahn* turned, in part, on the fact that the general statutory provision dealing with "property of the estate" - Section 541 - is expanded in Chapter 13 to include property acquired post-petition. *Harris v. Viegelahn*, 135 S.Ct. 1829, 191 L.Ed.2d 783 (2015). "The Chapter 13 estate, unlike a Chapter 7 estate, therefore includes both the debtor's property at the time of his bankruptcy petition, and any assets he acquires after filing. §1306(a)." *Harris*, 135 S.Ct. at 1833.

In short, it comes down to the language of the statute. There are many examples in the Bankruptcy Code of the same provisions leading to different results in different Chapters of the Code. In determining the limits of those differences, the rules in Section 103 regarding the applicability of the Chapters, and Subchapters, are part of the "plain meaning" of the Bankruptcy Code's provisions.

Finally, there may be a lesson in an earlier line of cases that addressed the proof of claim deadline in Chapter 13 cases, and the disallowance of claims. In 1992, the en banc *Hausladen*

---

[10]/ *See*, *In re Travers*, 541 B.R. 639 (Bankr. E.D. Ky. 2015).

decision dealt with a Chapter 13 trustee's objections to claims that had been filed after the claims bar date. *See*, *In re Hausladen*, 146 B.R. 557 (Bankr. D. Minn. 1992). In interpreting the then-current versions of Bankruptcy Rule 3002, §501 and §502, the *Hausladen* decision, while noting that the provision was "not directly applicable in a Chapter 13 case", found support for not disallowing the late filed claims in the language of §726. *In re Hausladen*, 146 B.R. at 560. The majority of courts appear to have rejected the holding in *Hausladen*. The *Tucker* decision, citing §103(b) in a footnote, specifically stated: "reliance on §726 is misplaced, especially in a Chapter 13 case. Initially, §726 applies only to Chapter 7 cases and thus is inapplicable to the case at bar. However, the court in *Hausladen* relied, without elaboration, on §726 to make a statutory construction argument." *In re Tucker*, 174 B.R. 732, 741-742 (Bankr. N.D. Ill. 1994)(footnotes omitted); *see also*, *In re Gullatt*, 169 B.R. 385, 389 (D. Tenn. 1994)("Since this is a Chapter 13 case, §726 does not apply."); *In re Husman*, 276 B.R. 596, 598 (Bankr. N.D. Ill. 2002)("§103(b) of the Code helps to resolve any ambiguity by stating that Subchapters I and II of Chapter 7, which includes §726, only apply to a case 'under such chapter.'").

Subsequently, Congress added §502(b)(9) in the Bankruptcy Reform Act of 1994, making it clear that filing a late claim is grounds for that claim being disallowed. The court in *Bloebaum* noted: "The commentator's reasoning matches Congress' stated intent in amending §502(b). The Congressional Record states that: '[t]he amendment to section 502(b) is designed to overrule *In re Hausladen*, 146 B.R. 557 (Bankr. D. Minn. 1992), and its progeny by disallowing claims that are not timely filed.' 140 Cong. Rec. H10,752, H10,768 (1994) (Congressman Brooks)." *In re Bloebaum*, 311 B.R. 473, 477 (Bankr. W.D. Tex. 2004). Thus, in at least one instance, Congress has responded where the courts have not respected the clear instructions in Section 103 regarding the applicability of the Chapters and Subchapters of the Code.

      **B.**     *Ransom*, **Limiting Terms, And Appeals To "Reality".**

Many of the cases holding that §707(b)(2)(A)(iii)(I) does not permit a Chapter 7 debtor to deduct secured debt when the collateral is being surrendered rely, in part, on the holding in *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011).

Like *Lanning*, *Ransom*'s focus was on a single word[11] within §707(b)(2)(A)(ii)(I)[12] - "applicable". *See*, *Ransom v. FIA Card Services, N.A.*, 562 U.S. at 69, 131 S.Ct. at 724 ("The key word in this provision is 'applicable': A debtor may claim not all, but only "applicable" expense amounts listed in the Standards."). While the subsection interpreted by Ransom included the word "applicable", other subsections of §707(b)(2) contain different terms of limitation. Specifically, while the term "applicable" appears in §707(b)(2)(A)(ii)(I), it does not appear in §707(b)(2)(A)(iii)(I). *See*, *In re Behague*, 497 B.R. 340, 342 (Bankr. M.D. Fla. 2012)("Section 707(b)(2)(A)(iii) contains neither a reasonableness limiter such as an 'applicable' expense, nor the pinpoint limiter of an 'actual' expense. Section 707(b)(2)(A)(iii) deals solely with payments on account of secured debts.")(footnotes omitted); *In re Sonntag*, 2011 WL 3902999 at *3, 2011 Bankr. LEXIS 3304 at *7 (Bankr. N.D. W.Va. Sept. 6, 2011)("Here, in contrast, the language at issue is not §707(b)(2)(A)(ii)(I), but §707(b)(2)(A)(iii), which does not contain the word 'applicable.'").

One rule of statutory construction holds that the use of a term in one part of a statute, and not in another, may be presumed to be intentional. *See*, *Gozlon–Peretz v. United States*, 498 U.S. 395, 404, 111 S.Ct. 840, 846-847, 112 L.Ed.2d 919 (1991)("[w]here Congress includes particular language in one section but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"); *General Motors Corp. v. United States*, 496 U.S. 530, 541, 110 S.Ct. 2528, 2532, 110 L.Ed.2d 480 (1990); *Russello v. U.S.*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). While not always followed, the use of this presumption has been said to be particularly appropriate in circumstances where statutory language has a plain meaning, and the argument is being made to narrow that plain meaning. *See*, *Kapral v. United States*, 166 F.3d 565, 579 (3d Cir.1999)(Alito, J., concurring)[13]. This presumption that omissions are intentional has also been more likely to be favored when all of the statutory

---

[11]/ "The analysis in *Lanning* and *Ransom* turned on language not applicable to the question at hand." *In re Navin*, 526 B.R. 81, 85 (Bankr. N.D. Ga. 2015).

[12]/ "The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the [IRS] for the area in which the debtor resides."

[13]/ The full quote is: "*Russello* ... was a case in which the statutory language at issue had a plain meaning, an argument was made that the statutory language should be interpreted more narrowly than that plain meaning, another provision of the same statute used different language to convey that narrower meaning, and the Court therefore presumed that the provision at issue meant what its language plainly stated and did not have the artificially narrow meaning explicitly set out in the other, more narrowly crafted statutory section."

22

sections were enacted simultaneously, like the Means Test provisions of Section 707(b). *See*, *Field v. Mans*, 516 U.S. 59, 66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), *citing*, *Gozlon–Peretz v. United States*, 498 U.S. at 404, 111 S.Ct. at 846 (noting that a single enactment created the provisions with the language that differed).

Looking at Section 707(b)(2), the various limitations placed upon the income and expense criteria would seem to support the idea that the absence of "applicable" or "applicable-like" language was intentional. *Cf.*, *Ransom*, 562 U.S. at 82-83, 131 S.Ct. 731-732 (Scalia, J., dissenting)(pointing out that "applicable" was used more clearly in connection with care of elderly or chronically ill family members under §707(b)(2)(A)(ii) (II), that health and disability insurance, and other expenses under §707(b)(2)(A)(ii)(I) are specifically limited to "actual . . . expenses" that are "reasonably necessary", and that a similar actual and necessary limitation is applied to deductions for energy under §707(b)(2)(A)(ii)(V)); *see also*, *In re Vanhoose*, 2007 WL 6383334 at *5, 2007 Bankr. LEXIS 4032 at *15 (Bankr. N.D. Ohio May 21, 2007)[14]; *In re Behague*, 497 B.R. 340, 432 n. 2 (Bankr. M.D. Fla. 2012).

In contrast to the provision governing the motor vehicle ownership deduction in *Ransom*, a review of the text of §707(b)(2)(A)(iii)(I) does not reflect the presence of words of limitation comparable to those used in other subsections that make up the Means Test.

In interpreting the application of the motor vehicle ownership deduction, the Supreme Court began with the language of the statute itself, and the ordinary meaning of the word "applicable". *Ransom*, 562 U.S. at 69, 131 S.Ct. at 723-724. The court viewed the word "applicable" as "a filter" established by Congress. *Ransom*, 562 U.S. at 69-70, 131 S.Ct. at 724. Based upon the "text, context and purpose of the statutory provision", *Ransom* held that debtors who owned a vehicle free and clear could not take the "ownership deduction".

Part of the reasoning behind the *Ransom* decision was the definition of "disposable income" in §1325(b)(2). "This reading of 'applicable' also draws support from the statutory context. The

---

[14] "Where Congress intended that actual expenses be deducted from CMI, it expressly so stated. *See* §707(b)(2)(A)(ii)(I) (providing that certain categories of expenses "shall be ... the amounts specified under the National Standard and Local Standards, but permitting the debtor's 'actual monthly expenses' for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service); §707(b)(2)(A)(ii)(II) (permitting the continuation of 'actual expenses paid' that are reasonable and necessary for care and support of elderly, chronically ill, or disabled household members and certain other family members); §707(b)(2)(A)(ii)(IV) (permitting under certain conditions, the 'actual expenses' for a dependent to attend a private or public elementary or secondary school);..."

23

Code initially defines a debtor's disposable income as his 'current monthly income ... less amounts *reasonably necessary to be expended.*'" *Ransom*, 562 U.S. at 70, 131 S.Ct. at 724 (emphasis in *Ransom*). Again, this Chapter 13 definition of "disposable income", a term that does not even appear in §707, and thus cannot be part of the statutory language of §707(b). *See*, §103(b); *In re Ray*, 362 B.R. 680, 682 (Bankr. D.S.C. 2007)[15].

Therefore, "disposable income", and the definition of that term, which incorporates the concept of "reasonably necessary" into Chapter 13 expenses, are not part of the statutory language in §707(b). Instead, in §707(b)(2) the terms "reasonably necessary" and "reasonable and necessary" are applied to specific types of expenses on an individual basis:

- "*reasonably necessary* health insurance, disability insurance, and health savings account expenses for the debtor, the spouse of the debtor, or the dependents of the debtor." §707(b)(2)(A)(ii)(I) (emphasis added).

- "the debtor's *reasonably necessary* expenses incurred to maintain the safety of the debtor and the family of the debtor from family violence" §707(b)(2)(A)(ii)(I) (emphasis added).

- "if it is demonstrated that it is *reasonable and necessary*, the debtor's monthly expenses may also include an additional allowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards issued by the Internal Revenue Service." §707(b)(2)(A)(ii)(I) (emphasis added).

- "the continuation of actual expenses paid by the debtor that are *reasonable and necessary* for care and support of an elderly, chronically ill, or disabled household member or member of the debtor's immediate family (including parents, grandparents, siblings, children, and grandchildren of the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case who is not a dependent) and who is unable to pay for such *reasonable and necessary* expenses." §707(b)(2)(A)(ii)(II) (emphasis added).

---

[15]/ While holding, on a different basis, that secured debts could not be deducted where the collateral was being surrendered, the *Ray* decision stated: "The UST argues that this Court's holding in *In re Edmunds*, 350 B.R. 636 (Bankr.D.S.C.2006), a chapter 13 case, controls. Since the holding in *Edmunds* rests on §1325(b)(3), it is not applicable to this chapter 7 case. Thus we turn to §707(b)(2) in the context of a chapter 7, without the gloss of "amounts reasonably necessary to be expended" found in chapter 13."

- "actual expenses for each dependent child less than 18 years of age, not to exceed $1,500 per year per child, to attend a private or public elementary or secondary school if the debtor provides documentation of such expenses and a detailed explanation of why such expenses are *reasonable and necessary*" §707(b)(2)(A)(ii)(IV) (emphasis added).

- "an allowance for housing and utilities, in excess of the allowance specified by the Local Standards for housing and utilities issued by the Internal Revenue Service, based on the actual expenses for home energy costs if the debtor provides documentation of such actual expenses and demonstrates that such actual expenses are *reasonable and necessary*." §707(b)(2)(A)(ii)(V) (emphasis added).

While the limiting words "reasonable" and "necessary" are found in other subsections of §707(b)(2), they do not appear in §707(b)(2)(A)(iii)(I). Like the absence of the term "applicable", the same case law authority supports finding the absence of these limiting terms to be intentional.

### 1. The Words "Scheduled As" in Section 707(b)(2)(A)(iii)(I).

Some of the Chapter 7 decisions that deny a deduction where the debtor is not reaffirming on the secured debt find either a limiting term, or a statutory ambiguity, in the words "scheduled as" in §707(b)(2)(A)(iii)(I). These cases do not all agree on why "scheduled as" serves this limiting function. Some hold that the term "scheduled" includes both the Schedules (Schedules A/B through J) as well as the Statement of Intention. *See e.g.*, *In re Byers*, 501 B.R. 82, 87 (Bankr. E.D.N.C. 2013). Other courts hold that "scheduled" should be viewed as a term of art: "This Court agrees with those decisions that interpret the phrase "scheduled as" to be a term of art in bankruptcy parlance that refers to a debtor placing information on the bankruptcy schedules." *In re Fredman*, 471 B.R. 540, 550 (Bankr. S.D. Ill. 2012). In addition to *Fredman*, cases holding "scheduled as" to be a term of art in bankruptcy include: *In re Skaggs*, 349 B.R. at 599; *In re Ray*, 362 B.R. 680, 685 (Bankr.D.S.C.2007); *In re Haar*, 360 B.R. 759, 764–65 (Bankr.N.D.Ohio 2007); *In re Singletary*, 354 B.R. at 467; *In re Harris*, 353 B.R. at 309–10.

Recent Supreme Court cases have generally taken a different view. In the absence of a well-known meaning at common law[16], or the Model Penal Code[17], the Supreme Court has generally

---

[16]/ *See*, *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 351, 443, 133 L.Ed.2d 351 (1995)("It is ... well established that '[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these

interpreted the language of the Bankruptcy Code using an "ordinary meaning" approach. *See*, *Baker Botts L.L.P. v. ASARCO LLC*, 135 S.Ct. 2158, 2165 n.2, 192 L.Ed.2d 208 (2015); *Clark v. Rameker*, 134 S.Ct. 2242, 2246, 189 L.Ed.2d 157 (2014)("The Bankruptcy Code does not define 'retirement funds,' so we give the term its ordinary meaning."); *Ransom*, 562 U.S. at 69, 131 S.Ct. at 724 ("Because the Code does not define 'applicable,' we look to the ordinary meaning of the term."); *Lanning*, 560 U.S. 513, 130 S.Ct. at 2471 ("When terms used in a statute are undefined, we give them their ordinary meaning."); *Rousey v. Jacoway*, 544 U.S. 320, 330, 125 S.Ct. 1561, 1568, 161 L.Ed.2d 563 (2005)("The Bankruptcy Code does not define the terms 'profitsharing,' 'stock bonus,' 'pension,' or 'annuity.' Accordingly, we look to the ordinary meaning of these terms."); *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993)("Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'").

As earlier decisions have noted, the phrase "scheduled as" appears only twice in the Bankruptcy Code, in §707(b)(2)(A)(iii)(I) and §1111(a). *See*, *In re Nockers*, 357 B.R. 497, 502 (Bankr. E.D. Wis. 2006)("[A]lthough the Bankruptcy Code uses the phrase 'scheduled as contractually due' only once (in § 707(b)(2)(A)(iii)), it also uses the phrase 'scheduled as' only one time—in §1111(a)...."). Courts rejecting a bankruptcy-specific meaning have relied, in part, on that other use of the term "scheduled as" in §1111(a). Other courts, in rejecting a bankruptcy-specific meaning, have noted that §1111(a) was much clearer in its intent, specifically referencing the statutory provision requiring the filing of schedules:

> For example, the only time Congress used the phrase "scheduled as" in the Code, it intended to employ the bankruptcy-specific meaning of the phrase because it specifically references schedules filed under section 521(a). *See* 11 U.S.C. §1111(a) ("A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that *appears in the schedules* filed under section 521(a) or 1106(a)(2) of this title, except a claim or interest that is *scheduled as* disputed, contingent, or unliquidated.")

---

terms.'").

[17]/ *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-274, 133 S.Ct. 1754, 1759-1760, 185 L.Ed.2d 992 (2013).

*Masur v. Fokkena*, 2009 WL 3150891 at *6, 2009 U.S. Dist. LEXIS 93343 at *17 (D.S.D. Sept. 30, 2009)(emphasis in original); *see also*, *In re Hayes*, 376 B.R. 55, 61 (Bankr. D. Mass. 2007).

Similarly, as *Nockerts* noted, there are two places where the word "scheduled" is used to mean "placed on the Schedules": Sections 523(a)(3) and 554(c). In both instances cited by *Nockerts*, there is an accompanying reference to Section 521(a)(1)[18]. *Nockerts*, 357 B.R. at 502; *see also*, *In re Makres*, 380 B.R. 30, 35 (Bankr. N.D. Okla. 2007); *In re Gaylon*, 366 B.R. 164, 168 (Bankr. W.D. Okla. 2007); *In re Sorrell*, 359 B.R. 167, 185 (Bankr. S.D. Ohio 2007).

Notably, while §1111(a) ["scheduled as"], §523(a)(3) ["scheduled"] and §554(c) ["scheduled"] specifically reference "section 521(a)(1)" - that subsection does not include the debtor's Statement of Intention, where debtors indicate whether they plan to surrender, redeem or reaffirm. Instead, the debtor's Statement of Intention is found in section 521(a)(2).

However, the two examples of "scheduled" in §523(a)(3) and §554(c) are not the only examples where the word "scheduled" is used to mean "listed in the Schedules". The word "scheduled" in §523(a)(10), for example, references debts that "could have been listed or scheduled by the debtor in a prior case", and appears to use the term to mean the bankruptcy "Schedules". In contrast to the provisions cited by *Nockerts*, there is no reference in §523(a)(10) to §521 or any of its subsections.

There are other places where the word "scheduled" is used on the Code to refer to a repayment schedule. As the *Sorrell* court noted:

> [I]n §524(k)(3)(H)(ii), which addresses reaffirmation agreements, the term "scheduled" is referring to a repayment schedule. In §1326(a)(1)(B), the term "scheduled" refers to pre-confirmation lease payments. In an analysis of the use of the word "scheduled" within the surrounding language of these two examples, the word "scheduled" does not refer to the bankruptcy schedules. Sections 524(k)(3)(H)(ii) and 1326(a)(1)(B) has three commonalities with §707(b)(2)(A)(iii)(I): 1) all the provisions were added in the 2005 Act; 2) all the provisions address circumstances where a debtor scheduled payments in a lease or contract and 3) those sections do not refer to the bankruptcy schedules.

*In re Sorrell*, 359 B.R. at 185; *see also*, *In re Hayes*, 376 B.R. at 62.

---

[18]/ References to "521(1)" were changed to "521(a)(1)" in the Bankruptcy Technical Corrections Act of 2010.

27

It also appears that the word "scheduled" in Section 524(m)(1) is not a reference to the Schedules, nor to any "scheduled payment" that may have been listed on the debtor's Schedules. Rather, the "scheduled payments on the reaffirmed debt" appears to be referencing the payments listed in the reaffirmation agreement, which may be less than the regular periodic pre-petition payment if, for example, the creditor allows the debtor to reaffirm on only part of the obligation[19], or the parties otherwise negotiate a lower monthly payment. *See e.g.*, *In re Stillwell*, 348 B.R. 578, 581 n.6 (Bankr. N.D. Okla. 2006)("[w]here the amount of the scheduled payments due on the reaffirmed debt (*as disclosed in the debtor's statement*) exceeds the debtor's available income.")(emphasis added); *In re Wilson*, 363 B.R. 220, 224 (Bankr. D.N.M. 2007)("Thus it is simply not accurate to check the "undue hardship" box if the statutory Part D numbers do not show a deficit *when the reaffirmed monthly payment is taken into account*.")(emphasis added).

Other Code sections where the word "scheduled" appears include §§363(c)(3), 1103(a), 1113(e), 1114(h)(2), 1116(2), which deal with the scheduled hearings and meetings. *See*, *In re Leary*, 2008 WL 1782636 at*4, 2008 Bankr. LEXIS 1204 at *11 (Bankr. S.D. Tex. April 16, 2008).

The words "schedule" or "schedules" - as opposed to "scheduled as" - appear in Section 707 three times.

The word "schedules" is used in §707(b)(2)(A)(ii)(III) in connection with permitting a Chapter 7 Means Test deduction for a Chapter 13 Trustee's fees, but only if the debtor is eligible for Chapter 13. *See e.g.*, *In re Rieck*, 427 B.R. 141, 145 n.3 (Bankr. D. Minn. 2010). The percentage permitted to be deducted is the actual administrative expenses of a chapter 13 plan for the district in which the debtor resides, "as determined under *schedules* issued by the Executive Office for the United States Trustee." §707(b)(2)(A)(ii)(III) (added in the 2005 Amendments).

Section 707(b)(2)(C) speaks of the petitioner filing "the *schedule* of current income and expenditures required under section 521". In that subsection, what is being referred to is the Means Test form. *See e.g.*, *In re Littman*, 370 B.R. 820, 823 n.9 (Bankr. D. Idaho 2007).

---

[19]/ Congress appears to have recognized the possibility of partial reaffirmation. For example, §362(h)(1)(B) provides debtor's special protection from stay relief on personal property where the Statement of Intention reflects a debtor's desire to reaffirm "on the original contract terms". This suggests that proposing a partial reaffirmation is permitted, but a debtor stating that intention does not trigger the additional protection from relief from stay found in (h)(1)(B).

Finally, §707(b)(4)(D) states that the signature of an attorney on the petition constitutes a certification that the attorney "has no knowledge after an inquiry that the information in the *schedules* filed with such petition is incorrect." In this subsection, the term "schedules" refers to the Schedules, and perhaps other documents filed with the petition.

Based on the absence of "term of art" interpretations of the Bankruptcy Code by the Supreme Court, and the different way in which "scheduled" is used in §707(b)(2)(A)(iii)(I), and because there is no reference to Section 521, many courts hold that the term "scheduled as" should be give an ordinary meaning, using a definition from a contemporary dictionary. *See e.g.*, *In re Ralston*, 400 B.R. 854, 862 (Bankr. M.D. Fla. 2009); *In re Longo*, 364 B.R. 161, 165 (Bankr. D. Conn. 2007)(citing cases); *In re Walker*, 2006 WL 1314125 at *3, 2006 Bankr. LEXIS 845 at *9 (Bankr. N.D. Ga. May 1, 2006).

Other courts focus on another problem in attempting to use "scheduled as" to limit the scope of §707(b)(2)(A)(iii)(I): if Congress had wished to exclude secured debt on properties where the debtor has filed a Statement of Intention indicating the collateral will be surrendered, "it could easily have said so." *In re Rudler*, 576 F.3d 37, 46 (1st Cir. 2009); *In re Randle*, 358 B.R. 360, 363 (Bankr. N.D. Ill. 2006).

On the other hand, there are several decisions that have found the term "scheduled as" to be a technical term that also serves as a limitation on a debtor's ability to deduct secured debt under §707(b)(2)(A)(iii)(I) where the collateral serving as security is being surrendered. *See*, *In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo. 2006); *In re Naut*, 2008 WL 191297, 2008 Bankr. LEXIS 175 (Bankr. E.D. Pa. 2008); *In re Burden*, 380 B.R. 194 (Bankr. W.D. Mo. 2007); *In re Ray*, 362 B.R. 680 (Bankr. D.S.C. 2007); *In re Harris*, 353 B.R. 304 (Bankr. E.D. Okla. 2006). Many of these decisions rely, in large part, on the statutory analysis in *Skaggs*.

The original statutory analysis in *Skaggs* has been criticized by *Nockerts* and other subsequent decisions as, at best, incomplete. *Skaggs* cited only §1111(a) and failed to note the fact that the provision includes a specific citation to §521(a)(1), which §707(b)(2)(A)(iii)(I) does not reference. *See, In re Nockerts*, 357 B.R. 497, 502 (Bankr. E.D. Wis. 2006); *In re Smale*, 390 B.R, 111, 116 (Bankr. D. Del. 2008): *In re Makres*, 380 B.R. 30, 35 (Bankr. N.D. Okla. 2007).

29

A more extensive look at the use of the term "scheduled as" was undertaken in *Leary*, which ultimately sides with the holding in *Skaggs* based upon binding circuit precedent[20]. Nevertheless, after an extensive review of provisions using the term "scheduled" the *Leary* court stated: "If this were the only context, the Court would conclude that filing a statement of intention to surrender collateral would have little effect on what is 'contractually due.'" *In re Leary*, 2008 WL 1782636 at*5, 2008 Bankr. LEXIS 1204 at *14 (Bankr. S.D. Tex. April 16, 2008). After quoting *Walker*, the court added: "Therefore, strict interpretation of the language of the statute would seem to allow deduction of these secured payments." *In re Leary*, 2008 WL 1782636 at*6, 2008 Bankr. LEXIS 1204 at *15.

The crux of the "scheduled as" argument, for courts denying Chapter 7 debtors a deduction for non-reaffirmed secured debts appears to be summarized as follows:

> Thus, if the debtor's bankruptcy schedules reflect his intention to surrender collateral and to cease paying the attendant debt, the future payments on these once-secured loans are no longer "scheduled." Courts that take this position support it by referencing the principle of statutory construction that mandates that a court give effect, if possible, to every clause and word of a statute. *Fredman*, 471 B.R. at 544 (citing *Harris*, 353 B.R. at 307). These courts reason that the snapshot-approach interpretation of "scheduled as contractually due" renders the words "scheduled as" superfluous, as all the snapshot-approach requires is that such payments be "contractually due." *Id*.

*In re White*, 512 B.R. 822, 828 (Bankr. N.D. Miss. 2014).

The answer to the argument in the first sentence is that a Chapter 7 debtor's "Schedules" do not reflect an intention to surrender - the Statement of Intention is where Chapter 7 debtors place that information. As there appears to be no instance in the Bankruptcy Code where "scheduled as", or even "scheduled", references §521(a)(2) - the provision dealing with the requirement that a debtor file a Statement of Intention - the textual basis that would support reading "scheduled as" as including not just the Schedules, but also the Statement of Intentions, is unclear. Further, as courts have noted, scheduling a debt has no effect on a secured obligation being contractually due. A

---

[20]/ The precedent followed in *Leary* was the Fifth Circuit's decision in *In re Cortez*, 457 F.3d 448 (5th Cir. 2006), based on pre-BAPCPA law, holding that post-petition events should be considered in evaluating a dismissal for substantial abuse. The holding in *Cortez* was also a factor in *In re Singletary*, 354 B.R. 455 (Bankr. S.D. Tex. 2006)(holding that declaring an intent to surrender collateral on a Statement of Intention does not extinguish debtors' right to deduct those payments as being "scheduled as contractually due," but debtors may not deduct payments on collateral that already has been surrendered as of the motion date.).

debtor's contractual liability is not eliminated upon the filing of bankruptcy. *See*, *In re Haar*, 360 B.R. 759, 764 (Bankr. N.D. Ohio 2007)("none of these events actually void the contract"); *In re Simmons*, 357 BR 480, 485 (Bankr. N.D. Ohio 2006)("a debtor's contractual liability is not eliminated upon the filing of a bankruptcy petition.").

Thus, while there are strong arguments, on each side, as to whether "scheduled as" has a common meaning, or a technical bankruptcy meaning, there appears to be little textual support for a "hyper-technical" bankruptcy meaning, where "scheduled as" means "scheduled and the debtor states they are reaffirming on the Statement of Intention". *See*, *In re Lindstrom*, 381 B.R. 303, 307 (Bankr. D. Colo. 2007)("The Statement of Intention is not a 'schedule' of debts."); *In re Randle*, 358 B.R. 360, 365 (Bankr. N.D. Ill. 2006)("There is no bankruptcy schedule that requires the debtor to list 'all amounts contractually due to secured creditors in each month of the 60 months following the date of the petition.' So there is no bankruptcy schedule to which §707(b)(2)(A)(iii) could refer."); *In re Galyon*, 366 B.R. 164, 169 n. 5 (Bankr. W.D. Okla. 2007)("The court thus respectfully disagrees with the unstated but clear implication of *Skaggs* that the Statement of Intention rendered the debt listed on the debtor's schedules as no longer 'scheduled.' "); *In re Sorrell*, 359 B.R. 167, 186 (Bankr. S.D. Ohio 2007)("[A] debtor's statement of intention is not a schedule. . . . The Bankruptcy Code, both before and after the 2005 Act, distinguished, in plain language, between a schedule and a statement of intention. *Cf*. § 521(a)(1)(B) and § 521(a)(2)."); *In re Vanhoose*, 2007 WL 6383334 at \*\*4-5, 2007 Bankr. LEXIS 4033 at \*13 (Bankr. N.D. Ohio May 21, 2007)(citing *Sorrell*).

To the extent that the term "scheduled as" is a "term of art", the claim in *White* that the words "scheduled as" are rendered superfluous is countered by examining the very provision that *Skaggs* relies on - Section 1111(a). The text of §1111(a)[21] includes, directly after the words "scheduled as", a reference that is clearly to a trio of designations that are only found in the Schedules - the familiar triumvirate of "disputed, contingent, or unliquidated".

In *Vanhoose*, after observing that: "In *Skaggs*, the court relied on the use of 'scheduled as' in §1111 (a) wherein Congress is clearly referring to bankruptcy schedules", Judge Whipple noted:

---

[21]/ "A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(a) or 1106(a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated."

Section 1111(a) provides that "a proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(1) or 1106(a)(2) of this title, except a claim or interest that is *scheduled as* disputed, contingent, or unliquidated." (Emphasis added). This use of "scheduled as" supports the interpretation in *Haar*, that a debt that is not scheduled as disputed, contingent, or unliquidated is "scheduled as contractually due."

*In re Vanhoose*, 2007 WL 6383334 at *6 n.2, 2007 Bankr. LEXIS 4032 at *16 n.2 (Bankr. N.D. Ohio May 21, 2007)(citation omitted).

In the *Haar* decision, Judge Speer explained why the term "scheduled as" is not a superfluous phrase in §707(b)(2)(A)(iii)(I), even if "scheduled as" is interpreted to be a bankruptcy "term of art":

To be sure, words in a statute are not to be read so as to render them superfluous. Hence, the elementary rule of statutory construction that, wherever possible, effect must be given to every word of a statute. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). However, this aid in interpretation is easily reconciled without, as the position of the UST requires, reading "scheduled as" as providing an independent basis to disallow deducting from a debtor's CMI payments made on secured property that will not be retained.

For certain categories of debts, secured obligations included, the holder of the debt has no present and vested claim against the debtor. For example, a debtor is required to list obligations for which he or she is a codebtor, but so long as the primary obligor has not defaulted, the debtor has no contractual duty to make payments on the debt at the time the petition is filed. This would also be the case with debts which are scheduled as disputed, contingent, or unliquidated.

Consequently, in some limited circumstances, scheduling a debt in a petition will denote that the obligation is not "contractually due," thereby giving effect to the term "scheduled as" in the statute. Conceptually this makes sense. A debtor should not be able to take a deduction under the 'means test' on a contingent obligation, such as that arising when a debtor co-signs on a loan for a child, which is not presently due and may never become due. However, this is a far cry from the position advocated by the UST: that scheduling a debt in a petition means that the obligation is, for all purposes, no longer "contractually due" within the meaning of §707(b)(2)(A)(iii)(I).

32

*In re Haar*, 360 B.R. 765-766.

In other words, the requirement that the secured debt be "scheduled as" contractually due prevents a debtor from simultaneously taking a secured debt deduction while also asserting, by checking a box located on the Schedules themselves, that there is no debt owed because liability is disputed, or that liability is dependent on a contingency which has not yet occurred. Thus, the phrase "scheduled as" is not superfluous. It serves a purpose in preventing debtors from taking inconsistent positions[22] regarding their secured debt. Debtors cannot claim the secured debt to be "contractually due" while, at the same time, asserting under penalty of perjury that there is no liability, or that liability depends on a contingency which has not yet occurred.

On the other hand, if the term "scheduled as" is given an ordinary meaning - stated in *Walker* to be "planned for a certain date" - there does not appear to be logical path to making the language of §707(b)(2)(A)(iii)(I) include a debtor's Statement of Intention. The use of the canon against surplusage "assists only where a competing interpretation gives effect to every clause and word of a statute." *Marx v. General Revenue Corp.*, 568 U.S. 371, 385, 133 S.Ct. 1166, 1177, 185 L.Ed.2d 242 (2013). Even if giving an ordinary meaning to "scheduled as" were to render the term "surplusage", the case law does not appear to reflect a competing interpretation, among the cases denying the secured debt deduction, that would give a more satisfying effect to the phrase.[23]

Thus, while many decisions discuss, and even rule on, the issue of whether "scheduled as" is a term of art or has a common meaning, several decisions ultimately conclude that the interpretation of "scheduled as" is not outcome-determinative on the issue of the deductibility of

---

[22]/ Courts are struggling with the proper limits, and the appropriate response, to a very similar type of inconsistency in determining whether judicial estoppel prevents a debtor from pursuing an unlisted pre-petition cause of action. *See e.g.*, *White v. Wyndham Vacation Owership, Inc.*, 617 F.3d 472, 476 (6th Cir. 2010).

[23]/ If the phrase "scheduled as" were viewed as requiring scheduled (i.e. periodic) payments in addition to contractual liability, the phrase "scheduled as" would not be superfluous if it were read to exclude secured debts for which no payments were due under the terms of the loan. While that would be a small subset of secured debts, there are housing rehabilitation and barrier removal programs in which mortgage loans are made, but no payments are due, and the loans are forgiven after the expiration of a fixed period provided there is no sale of the underlying real property and the debtor continues to use the property as a residence. *See e.g.*, *In re Estad*, 295 B.R. 905, 906 (Bankr. D. Minn. 2003). Similarly, reverse mortgages have no payment obligations and, arguably, should not create a monthly deduction in excess of the Means Test housing allowance for the state where the debtor resides. Congress could also have been concerned about loans from parents or other loved ones for a house or car, where the debt is secured by a mortgage or other lien, but there is no requirement for periodic payments. The counter-argument would be that secured debts that do not require payments are not "contractually due" - that the term "contractually *due*" already requires more than bare liability on a debt.

33

contractually due secured debt payments where the collateral is being surrendered. Whether "scheduled as" refers to payments scheduled to be made under the terms of a promissory note, or whether it means properly "listed in the bankruptcy Schedules", many courts find the "scheduled as" analysis to be a 'distinction without a difference.'" *In re Haar*, 360 B.R. 759, 765 (Bankr. N.D. Ohio 2007); *In re Lindstrom*, 381 B.R. 303, 307 (Bankr. D. Colo. 2007)("Thus, whether a secured debt is 'scheduled as' due in the dictionary sense, or is listed on bankruptcy schedules as debt owed by the debtor, the key determination is whether that debt was contractually due on the petition date."); *In re Hayes*, 376 B.R. 55, 62 (Bankr. D. Mass. 2007); *In re Vanhoose*, 2007 WL 6383334 at **4-5, 2007 Bankr. LEXIS 4033 at **12-13 (Bankr. N.D. Ohio May 21, 2007); *In re Wilkins*, 370 B.R. 815, 819 (Bankr. C.D. Cal. 2007)("The court's understanding of 'contractually due' makes the differing definitions of 'scheduled' insignificant."); *In re Gaylon*, 366 B.R. 164, 169 (Bankr. W.D. Okla. 2007)("If, however, the words 'scheduled as' should be construed to refer to the debtor's bankruptcy schedules rather than to a common usage meaning, the same result would obtain in the present case.").

As *Haar* stated: "Under either interpretation, the antecedent language 'scheduled as' does not alone modify the term "contractually due" in such a way so as to prevent a debtor from utilizing in the 'means test' equation payments being made on collateral that will ultimately be surrendered." *Haar*, 360 at 765.

Finally, this court finds the use of the "contractually due" concept to be a much stronger indication of the intent of Congress, particularly because it is coupled with the "following the date of the filing of the petition" language. Reading the term "scheduled" to make this provision mean "debts the debtor will actually be paying after the petition date" calls into question why the broad and mathematical language - "all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition" - is stated as a formula amendable to a mechanical application. Thus, under the plain meaning of §707(b)(2)(A)(iii)(I), "the key determination is whether that debt was contractually due on the petition date." *In re Lindstrom*, 381 B.R. 303, 307 (Bankr. D. Colo. 2007).

### 2. *Ransom* and "Reality".

Some cases denying deductions for surrendered property also make an additional arguments from the decision in *Ransom*: that there is a broad policy against "phantom" deductions and in favor

of "reality" or "actual circumstances". This argument does not appear to be persuasive in interpreting §707(b)(2)(A)(iii)(I) in the context of a Chapter 7 case.

The "reality" or "actual circumstances" are ignored where, for example, Means Test income is based upon the debtor's income during the previous six months. "Reality" is also ignored where Means Test deductions are based on the full amount of the National and Local Standards, rather than the actual amounts expended by debtors - even in Chapter 13 cases. *See*, *Lynch v. Jackson*, 853 F.3d 116 (4th Cir. 2017)(holding that "interpreting 'applicable' to mean 'actual,' . . . would create an absurd result"). Another reality defying aspect of the Means Test is that it requires courts to ignore income from Social Security[24], while failing to exclude income from veterans benefits[25].

It appears more likely, as the *Behague* court observed, that Congress made "certain trade-offs between what is an actual accurate picture of a debtor's financial situation and that which is standardized." *In re Behague*, 497 B.R. 340, 343 (Bankr. M.D. Fla. 2012).

Even looking at the facts in *Ransom* itself, the "reality" of its holding is certainly open to some debate. As the debtors argued in *Ransom*, the "economic reality" is that during a Chapter 13 Plan, a debtor with a paid off car would likely need to borrow to finance a new car in the five years their Chapter 13 plan would run. Moreover, as the dissent in *Ransom* points out, under the holding of majority, a debtor with one payment left would get the whole vehicle ownership deduction, as would a debtor who purchased a "junkyard car for a song plus a $10 promissory note payable over several years". *Ransom*, 562 U.S. at 84, 131 S.Ct. at 732 (Scalia, J., dissenting). The majority does not appear to disagree[26] with Judge Scalia's assessment of the potentially anomalous results from the rule announced in the decision. Instead, the *Ransom* majority states: "But this kind of oddity is the inevitable result of a standardized formula like the means test, even more under Ransom's reading than under ours. Such formulas are by their nature over- and under-inclusive." *Ransom*, 562 U.S. at 78, 131 S.Ct. at 729.

---

[24]/ *Baud v. Carroll*, 634 F.3d 327, 343 (6th Cir. 2011), *cert. denied*, 565 U.S. 1110, 132 S.Ct. 997, 181 L.Ed.2d 732 (2012);

[25]/ *In re Brah*, 562 B.R. 922 (Bankr. E.D. Wis. 2017); *In re Hedge*, 394 B.R. 463 (Bankr. S.D.N.Y. 2008); *In re Waters*, 384 B.R. 432, 437-38 (Bankr. N.D. W.Va. 2008).

[26]/ The majority brackets its acceptance of the inevitability of "oddities" of a standardized formula by acknowledging first the ability of a debtor to file with only a few car payments left, and claim the full deduction, and after, it credits Judge Scalia's "junkyard" car example. *Ransom*, 562 U.S. at 78-79, 131 S.Ct. at 729.

35

It appears that the lessons of *Ransom* and *Lanning* are that the courts should closely examine the language of the statute, not that there is an overarching policy that supports interpreting the Means Test - particularly in Chapter 7 cases - to fit a judicial view of "reality".

**C.    The Use Of A Simple Mechanical Approach In Screening Chapter 7 Cases Is Not Absurd.**

In addressing the "Means Test" enacted as part of the BAPCPA, *Lanning* and *Ransom* did not find that the overall concept of a Means Test was "absurd", or that it would "produce a result demonstrably at odds with the intentions of its drafters." *See*, *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004)("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'"; *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)("The plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.").

Thus, the issue is whether following the plain meaning of the particular subsection in issue, §707(b)(2)(A)(iii)(I), leads to an absurd result, or would "produce a result demonstrably at odds with the intentions of its drafters."

First, it is important to understand that §707(b)(2) is only the initial "screening mechanism". Standing behind the rough screening of §707(b)(2) is the much finer screen of §707(b)(3), and its "totality of the circumstances" test.

In legislative drafting, there is typically a spectrum of choice between certainty and equity. A bright line rule without exceptions has the virtue of providing certainty, but the cost is that there is no room for "fairness". A rule grounded in equity, that looks at the totality of the circumstances, provides an opportunity to mold the result based on equitable considerations, but it does not provide clear answers absent a judicial decision.

Section 707(b) provides both an arithmetic formula that provides a clear answer regarding whether or not a debtor is going to face a presumption of ineligibility for Chapter 7 relief [§707(b)(2)], and a "totality of the circumstances test" [§707(b)(3)] that allows a wide ranging inquiry whether granting Chapter 7 relief would be an "abuse". *See e.g.*, *In re Johnson*, 503 B.R. 447, 451 (Bankr. N.D. Ind. 2013); *In re Hardigan*, 2012 WL 9703097 at *4, 2012 Bankr. LEXIS 5873 at **9 - 10 (Bankr. S.D. Ga. Dec. 20, 2012). A similar position was taken in the *Smale*

36

decision - after finding §707(b)(2)(A)(iii)(I) to be ambiguous, the court held that the deduction of secured obligations where the collateral is being surrendered was permitted based on the proximity of §707(b)(3). "To allow a movant to include the outcome of future events as part of the means test would eliminate the distinction between the presumption of abuse test and the totality of the circumstances test." *In re Smale*, 390 B.R. 111, 117 (Bankr. D. Del. 2008), *quoting*, *In re Singletary*, 354 B.R. 455, 465 (Bankr. S.D. Tex. 2006).

Moreover, the use of a relatively simple mechanical test is important because the Chapter 7 Means Test performs a function at the front end of the bankruptcy process. Chapter 7 Means Test calculations are done in the offices of bankruptcy lawyers, meeting with clients who are facing financial difficulties. Presumably, having a clear, easily arrived at answer that a particular debtor will be facing a presumption that a liquidation filing will be found to be an "abuse" deters many debtors who would otherwise attempt to seek relief under Chapter 7.

The relative simplicity of the Chapter 7 Means Test is also important in that most bankruptcy cases in this country are filed under Chapter 7. These Means Tests have to be reviewed, and a determination has to be made, relatively quickly, as to whether the presumption of abuse arises or not. *See*, §704(b)(2)(A), §704(b)(2); *In re Rudler*, 576 F.3d 37, 44 n.10 (1st Cir. 2009); *Schultz v. U.S.*, 529 F.3d 343, 348 (6th Cir. 2008).

In addition, the decisions holding that secured debts cannot be deducted if the debtor does not intend to continue making payments raise certain questions about where the line would be drawn in allowing the secured debt to be deducted. Would checking the box that the debtor intends to reaffirm be enough - perhaps if they were to get a good enough loan modification from the secured lender? How about tendering a post-petition payment to the secured creditor, even if that payment may be returned? What about actually signing a reaffirmation agreement, and then rescinding it after the deadline to file a motion to dismiss under Section 707(b)(2) has passed? Where is the line to be drawn?

For example, in the *Byers* decision the court stated: "On his Statement of Intention, the debtor indicated that the property would be retained, that he intended to reaffirm the debt, and that the property would be claimed as exempt." *In re Byers*, 501 B.R. 82, 85 (Bankr. E.D.N.C. 2013). What the debtor actually wanted to do was sell the property, which had been listed for sale prior to filing. The court noted that the Statement of Intention did not "offer the debtor choices applicable

to his specific situation", and that the debtor had listed his intention to "retain" the property, which was the "less inaccurate of the two options" on the Statement of Intention. *Id*. Nevertheless, the *Byers* court looked beyond the Statement of Intention and found that the presumption arose under §707(b)(2).

Similarly, in *Hamilton*, the debtor apparently did not file a Statement of Intention, but "probably" was going to be forced to give up the house because asthma made it difficult to do yard work. *In re Hamilton*, 513 B.R. 292, 296 (Bankr. M.D.N.C. 2014). Again, the court found that the presumption arose, in part because relief from stay was granted, and also in part because no payments were listed as having been made in the 90 days prior to the filing of bankruptcy.

Another issue raised by the cases denying the secured debt deduction is what to do about increased taxes owed as a result of the property being surrendered. *See e.g.*, *In re Campbell*, 2016 WL 4150663 at *4 & *8, 2016 Bankr. LEXIS 636 at **10 - 12 & **22 - 23 (Bankr. E.D. Va. Aug. 3, 2016). If the "reality" approach is the touchstone for interpreting §707, the loss of the mortgage interest deduction can wipe out the presumption of abuse, as it did in *Campbell*. [*Id.*] However, doing such a calculation requires a sophisticated analysis of the debtor's tax situation that would add significant complexity and uncertainty to the preparation of the Chapter 7 Means Test form.

The related statutes, and their deadlines, also weigh against finding that a "plain meaning" reading of §707(b)(2)(A)(iii)(I) is "demonstrably at odds with intent of the drafters." At the same time the Means Test provisions were enacted, Congress also created the requirement for a Statement of Intention. The Statement of Intention is not required to be filed until 30 days after the date of the bankruptcy filing, or the date of the first meeting of creditors, whichever is earlier. *See*, §521(a)(2)(A).

The "statement" that is to be filed by the UST, asserting that the case is presumed to be an abuse under §704(b)(1)(A), is required to be filed within 10 days after the first meeting of creditors. The UST then has 30 days from the filing of the statement of presumed abuse to act, either by filing a motion to dismiss or convert, or by filing a statement setting forth the reasons the UST does not consider such a motion to be appropriate. *See*, §704(b)(2). As Collier on Bankruptcy states:

> If the United States trustee fails to file the notice required by section 704(b) on time, the United States trustee may not seek to dismiss the case based on a presumption of abuse under section 707(b)(2). However, the United States trustee may seek dismissal under section 707(b)(3) if that section is applicable.

38

6 Collier on Bankruptcy, ¶704.16[1] at 704-35 (16th ed. 2017); *but see*, *In re Persaud*, 486 B.R. 251, 260-262 (Bankr. E.D.N.Y. 2013).

While, at least theoretically[27], the debtor is required to perform his or her intention with respect to the property within 30 days of the first meeting of creditors under §521(a)(2)(B), the "hard deadline"[28] for reaffirming a debt is the date the discharge is granted. *See*, §524(c)(1) (agreement has to be "made before the granting of the discharge").

For a purchase money security interest in personal property, §521(a)(6) provides that the debtor shall not retain possession of personal property for more than 45 days after the first meeting of creditors, unless the debtor reaffirms - but the expiration of this deadline is usually going to be five days after the deadline for the U.S. Trustee to initiate a proceeding under §707(b)(2). *See*, §§704(b)(1)(A); §704(b)(2).

While the common practice of filing reaffirmation agreement more than 30 days after the first meeting of creditors is a practical problem for enforcement of the rule for the "no secured debt deduction without reaffirmation" decisions, the debtor's continuing right to rescind a reaffirmation agreement presents more of a structural problem.

Every reaffirmation agreement is subject to the debtor's right to give notice of rescission of the agreement, either prior to the discharge, or within 60 days after the agreement is filed with the court, whichever occurs later. *See*, §524(c)(4). Reaffirmation agreements are also subject to disallowance by the court as an undue hardship for 60 days after the agreement is filed with the court. *See*, §524(m)(1). Thus, there is no strong congruence between the deadline for the UST moving to dismiss under §707(b)(2) and the much later date when a debtor's liability for a reaffirmed secured debt is actually fixed. If Congress intended reaffirmation to be the prerequisite for taking the secured debt deduction under §707(b)(2), one has to question the absence of any

---

[27]/ *See*, 4 Collier on Bankruptcy, ¶521.14[4] at 521-48 (16th ed. 2017): "Section 704(a)(3) states that the trustee must ensure that the debtor perform the intentions specified pursuant to section 521(a)(2)(B). However, no particular enforcement powers are given to the trustee. It is also unlikely that the trustee will make much of an effort solely on behalf of a secured creditor unless that creditor is willing to compensate the trustee for services rendered."

[28]/ The "softer" reaffirmation deadline is a filing deadline of 60 days after the first date set for the first meeting of creditors under Bankruptcy Rule 4008(a). This deadline can be extended "at any time" in the court's discretion.

provision providing the UST with a right to proceed under §707(b)(2) if debtors exercise their right of recision on the debt after the expiration of the §704(b) deadlines.

Making the deduction contingent upon reaffirmation of the secured debt would also be contrary to a long history of congressional concerns about the reaffirmation of debts. When the Bankruptcy Code was enacted, the legislative history reflects deep concerns that "grew out of a long history of coercive and deceptive actions by creditors to secure reaffirmation...." 4 Collier on Bankruptcy, ¶524.04 at 524-21 (16th Ed. 2017)(citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 162-164 (1977); Report of the Bankruptcy Commission, H.R. Doc. 137, 93d Cong., 1st Sess., Part I, 177). More recently: "Cognizant of the very serious consequences that reaffirmation could have, Congress, through BAPCPA and its additions to § 524, sought to impose meaningful hurdles into the reaffirmation process." *In re Isom*, 2007 WL 2110318 at *3, 2007 Bankr. LEXIS 2437 at *11 (Bankr. E.D. Va. July 17, 2007)(emphasis omitted).

It would be odd for Congress to place additional hurdles to the reaffirmation process in §524, and then provide incentives for debtors to reaffirm their secured debts (or at least enter into the reaffirmation process) through a secured debt expense deduction rule in §707(b)(2) that only applied if the debtor reaffirmed.

Finally, recognition that "[a] primary intent of Congress in the passage of BAPCPA was to ensure that those debtors who can pay their debts do so"[29] does not mandate that every bankruptcy statute must be interpreted in the most draconian manner possible[30]. The efficient application of the Means Test, using §707(b)(2) as a screening mechanism[31], which in turn is backed up by

---

[29]/ *In re Skaggs*, 349 B.R. 594, 600 (Bankr. E.D. Mo. 2006).

[30]/ The Supreme Court's decision in *Lanning* actually involved the issue of whether or not a Chapter 13 Plan could be confirmed with a with a <u>lower</u> payment than the Means Test called for, because of a one time bonus in the six months prior to filing. Similarly, the decision in *Harris v. Viegelahn*, ___ U.S. ___, 135 S.Ct. 1829, 191 L.Ed.2d 783 (2015) held that monies could not go to Chapter 13 creditors, but instead, had to be given back to the debtor, in part because of differences between Chapter 13 and Chapter 7. "Can pay/do pay" does not supercede the plain language of the particular statute in issue.

[31]/ "The permitted deduction is for payments to 'secured creditors,' and is intended to test, for screening purposes, the ability of a debtor *on the filing date* to make payments on existing debt. Congress intended there to be an easily applied formula for determining whether the Court should *presume* that a debtor's chapter 7 case is an abuse. *Rivers*, 466 B.R. at 568. The chapter 7 means test is simply a screening mechanism to determine whether a chapter 7 proceeding is appropriate. *Id*. at 566. Given this formulaic approach, the means test, including the deductions for payments to secured creditors, must be applied as of the petition date without regard to future changes." *In re Hardigan*, 2012 WL 9703097 at *4, 2012 Bankr. LEXIS 5873 at *9 - *10 (Bankr. S.D. Ga. Dec. 20, 2012)(emphasis in original).

40

§707(b)(3)'s "totality of the circumstances" test, serves to provide both a certain barrier, and an ability to conduct a more flexible exploration of a debtor's circumstances.

### D. Conclusion Regarding Section 707(b)(2).

For all of the reasons set forth above, the court finds that §707(b)(2)(A)(iii)(I) has a plain meaning, that the cases holding otherwise are not persuasive, and that applying the plain meaning is neither absurd, nor does it produce a result demonstrably at odds with the intentions of its drafters. Accordingly, the presumption of abuse under §707(b)(2) does not arise in this case.

## II. Is The Filing An Abuse Under Section 707(b)(3)'s Totality Of The Circumstances Test?

As the movant, the UST carries the overall burden of demonstrating, by a preponderance of the evidence, that Debtor's case should be dismissed. *In re Weixel,* 494 B.R. 895, 901 (B.A.P. 6th Cir. 2013).

In this case, the UST does not argue that Debtor filed her petition in bad faith. Instead, the UST asserts that the totality of Debtor's financial circumstances demonstrates that she is not needy and that granting the Debtor a discharge would be an abuse of the provisions of Chapter 7. The "totality of the circumstances test" allows the court to consider both pre-petition and post-petition circumstances. *See, U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006)("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Ng,* 477 B.R. 118, 130-131 (9th Cir. 2012); *In re Mestemaker,* 359 B.R. at 855-56.

Debtors are "needy" when "[their] financial predicament warrants the discharge of [their] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126; *McGowan*, 445 B.R. at 824; *In re Robinson*, 2015 WL 1087316 at *3, 2015 Bankr. LEXIS 719 at *8 (Bankr. N.D. Ohio March 9, 2015). Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing,

41

shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see also, Krohn*, 886 F.2d at 126.

Debtor's schedules show that she is eligible to be a debtor under Chapter 13. Her secured and unsecured debts are less than the Chapter 13 debt limits. *See*, 11 U.S.C. §109(e). Melissa A. Arndt has regular income that appears to be relatively stable, although she received a demotion that led to her bankruptcy, and described work availability challenges. Her income also varies based upon available work hours and overtime.

Under §707(b)(3), the UST argues that Debtor has sufficient disposable income to repay at least a portion of her unsecured debts out of future earnings, in a Chapter 13 plan or otherwise. The UST argues that the mortgage loan payment deduction of $1,475 per month is not a proper deduction, and should instead be "applied to a ratable distribution among all Debtors' unsecured creditors." *In re Robinson*, 2015 WL 1087316 at *3, 2015 Bankr. LEXIS 719 at **10-11 (Bankr. N.D. Ohio March 9, 2015). Further, the Debtor has surrendered two recreational vehicles - a jet ski and a four wheeler - and those payments should also be added back in looking at the totality of the Debtor's circumstances.

The UST also presented evidence about the Debtor's post-filing work history. Because of a lack of work locally, the Debtor took a position in North Carolina. From the Debtor's description, the job involved at least some supervisory duties, and the work hours were plentiful. Debtor's income was higher during this time, but her expenses also increased, living away from home.

While there were many potential issues presented regarding Debtor's time in North Carolina, the UST failed to demonstrate that the Debtor's earnings and expenses during that post-filing time period were going to impact her future financial situation at the time the matter was presented to the court for decision. At the time of Hearing, the North Carolina job had ended, and the Debtor was temporarily unemployed while waiting for local pipe-fitting work to become available.

The evidence the court found most relevant to Debtor's financial situation going forward was her earnings and expenses during the time prior to filing. It did not appear to the court that the Debtor particularly enjoyed working away from home and, in her mind, the extra income was essentially a wash because of the increased expenses associated with the unreimbursed additional

costs of housing, food and entertainment.[32]  More importantly, the job in North Carolina had been completed, and there was no evidence presented that any out-of-town work opportunities would become available in the future.  Even if another out-of-town job was offered, there is no way to know whether the main cost savings strategy the Debtor employed - renting a trailer, or some other substitute for staying in a hotel - would be possible.

The Debtor testified that she believed her earnings would decrease, based upon the lack of work and the number of times she would have to wait a week, without pay, to qualify for unemployment, and the reduction in income when she did receive unemployment.  While the court finds that the Debtor was honestly stating her beliefs regarding her employment situation, there was little corroborating evidence presented to support her contention.  Accordingly, the court finds that both the UST and the Debtor have failed to present sufficient evidence to use an income number different from the average monthly income the Debtor received in the six month prior to filing.

Using the income and expense information from the Petition, Schedules, Statement of Affairs, Statement of Intention and the Means Test, and looking at the "totality of the circumstances", the expense listed on the Means Test for Debtor's mortgage on the Elmore property should be reduced to the amount of the standard housing expense for a single person.  Thus, the deduction of $1,475 should be reduced to $597 a month, a reduction of $878 per month.  The court could select a lower number for the housing expense - the amount that the Debtor pays for rent to her mother or $300 per month.  However, the court declines to go below the amount of the IRS allowance for two reasons.  First, the rent the Debtor actually pays would entitle her to the full housing allowances on the Means Test.  Second, the Debtor's move to live with her mother was recent, it was based on her being unable to afford her mortgage payment, and is not a living arrangement that had a long pre-petition history, demonstrating its viability.  The Debtor described her living situation as temporary, and that her search for an alternate living arrangement had been interrupted by the opportunity in North Carolina.  Thus, the ability to sustain the living arrangement with her mother over a long period of time has not really been tested because Debtor spent most of

---

[32]/ If there had been evidence that the financial circumstances the Debtor experienced while on the "North Carolina job" were going to continue for the foreseeable future, the court would have granted the UST's Motion to Dismiss under §707(b)(3).

her time out of town for several months, working in North Carolina.[33]  Accordingly, the court finds the IRS allocation for living expenses for a single person to be more likely to be a reasonable expense over a five year period, if Debtor's income does remain consistent with her pre-petition earnings.

The deduction in the amount of $73.75 on Line 34 of the Means Test for "cure" expenses for the mortgage debt on the home being surrendered, is not an expense the Debtor will actually be incurring in the future, and should not be included in determining whether or not the Debtor can fund a Chapter 13 Plan.

The UST requested a reduction of $625 per month for home repairs. [Doc. #1, p. 49]. However, this was not an actual deduction on the Means Test.  Rather, it was listed under "special circumstances" on Line 43, and was not part of the calculation of total deductions on Line 38, or the calculation of "monthly disposable income" on Line 39c.  To the extent listing this amount for repairs was an invitation for the court to consider some allowance of this "expense", the court declines to do so.

On the other hand, the additional deduction of $400 a month on Line 10 for "propane heat large home" was deducted on the Means Test.  [Doc. #1, Line 10].  However, it is not a current or future expense the Debtor is or will be incurring.  Debtor's testimony was that at the time of the Hearing she paid $300 in rent, and approximately $300 toward utilities.[34]  Thus, the "Housing and utilities - Insurance and operating expenses" on Line 8, in the amount of $437, will be the allowed expense, with no upward adjustment.

The deductions for the 2015 Polaris Assault snowmobile had associated deductions of $119 per month, and a "cure" of $11.90. [Doc. #1, p. 47].  Neither of those expenses were part of the Debtor's actual budget at the time of the Hearing, and will be eliminated for purposes of the §707(b)(3) analysis.  Similarly, the deduction of $84.50 a month, plus $8.45 per month for "cure"

---

[33]/  Moreover, if the test were viewed as: "Does being unwilling to live in a small residence with your mother for five years render a Chapter 7 bankruptcy an abuse?", I believe most would answer that question in the negative.

[34]/  It appears the $300 a month for "utilities" does not cover all of the utilities that are covered by the allowance on Line 8, which include residential telephone service, cell phone service, cable television, and internet service.  *See e.g.*, *In re Currie*, 537 B.R. 884, 887 (Bankr. C.D. Ill. 2015)(citing IRS Collection Financial Standards). Debtor testified that she currently pays approximately $140 to $160 a month for her cell phone.

44

on the 2015 Polaris Sportsman 850 SP ATV will also be eliminated from the Debtor's budget calculation. [Doc. #1, p. 47]. The deductions being eliminated for these two vehicles total $223.85.

The vehicle operating expense of $191 per month does not reflect the actual expenses the Debtor incurs in driving to "local" job sites in her large diesel pick up truck, hauling her pipe fitting equipment. However, the Debtor did not provide evidence that would support the claim on Line 43 [Doc. #1, p. 49] for an additional $1,028 per month, over and above the $191 per month vehicle operating expense on Line 12. Debtor's testimony substantiated a number closer to what was listed on Schedule J, a total expense for "Transportation"[35] of $800. [Doc. #1, p. 28]. Accordingly, the court will allow an increase in the allowed expense on Line 12 of the Means Test, from $191, to $800. That is an increase of $609 per month, to more accurately reflect Debtor's actual transportation costs that are required for her job. [Doc. #1, p. 43].

There was also testimony that the Debtor pays $230 per month for insurance on the Dodge Dakota pick up truck, an unusually high amount.

Using these adjustments to the Debtor's budget, which are a combination of Means Test allowances and actual expenses that the court believes most accurately reflect the "totality of the circumstances", the court finds the proper expense deductions to be:

**Total Claimed Deductions on Means Test - $5,276.40**

**Reduced by:**

1. $878 per month for the mortgage payment the Debtor is no longer making.

2. $73.75 for "cure" expenses for the mortgage Debtor is not curing.

3. $400 for the expense of heating a large home with propane that Debtor is not incurring.

4. $223.85 for ownership and cure expenses for the surrendered snowmobile and ATV.

**Increased by:**

1. $609 per month for Debtor's actual unreimbursed travel expenses to job sites.

2. $230 per month for motor vehicle insurance on the pick up truck.

**Net Decrease in Expenses - $736.60.**

---

[35]/ On Schedule J, Line 12 states: "Transportation. Include gas, maintenance, bus or train fare. Do not include car payments." Debtor listed an expense of $800 for Line 12. The Debtor testified that she paid $85 for diesel to fill her 32 gallon tank one-and-a-half to two times a week. $85 x 2 x 4.3 weeks in a month = $731. She based this on a diesel price of $2.49, but $2.50 x 32 = $80.

45

**Adjusted Expense Deduction: $4,539.80.**

Debtor's adjusted monthly income was listed as $4,229 per month. If this had actually been her properly computed income, for Means Test purposes, then her adjusted expenses of $4,309.80 would have resulted in a negative $310.80 per month being available to fund a Chapter 13 Plan. However, the UST presented evidence that Debtor's pre-petition income was substantially higher than the amount listed on the Means Test. *See*, UST Exhibit 2. The gross income, as shown on that exhibit, was substantially higher than the figures used on Schedule J or the Means Test.

The UST suggested that the proper figure, based on the Debtor's Employment Verification document, is $6,799.17 per month.[36] Based on the evidence in Exhibit 2, which was admitted without objection, the Debtor's income in the sixth months prior to filing was clearly substantially higher than the amount listed by the Debtor on Schedule I and the Means Test. The amount used for Debtor's monthly income was apparently based upon a calculation that did not use a gross income figure as required by the Bankruptcy Code, Rules, and the Means Test Official Form, and instead improperly deducted certain business expenses from income to arrive at the $4,229 per month figure.

Debtor responded to the UST's income numbers by introducing Debtor's Form 2106 "Employee Business Expenses" from her 2016 income tax return. [Ex. A]. The Form 2106 reflects total business expenses of $30,191 for 2016. [*Id.*] More than half of those expenses were $17,637 for vehicle expenses. [*Id.*] Debtor testified that her gross income was over $100,000 for 2016, although that included income from prior to her demotion in April of 2016.

It should be noted that the amount being allowed for Debtor's transportation costs in this analysis are far higher than those that would be permitted on the Means Test. Those monthly expenses include: 1) a truck payment of $873; 2) transportation costs of $800; and 3) insurance of $230. That totals $1,903 for transportation related costs, or $22,836 per year.

The Debtor did not present much in the way of evidence regarding expenses for work related equipment and clothing, or the costs of lodging when she was not in North Carolina. There was testimony, in response to questions by the UST, about a welding mask, a hotel stay, and socks and pants for work. No unreimbursed work related expenses were listed on Schedule J perhaps, in part,

---

[36]/ Usually, this issue would be the subject of testimony by a UST analyst. Counsel's "suggestion" is not evidence. *See e.g.*, *In re Duncan*, 406 B.R. 904, 908 (Bankr. D. Mont. 2009).

because of the non-statutory "netting" that was done in arriving at the monthly income figure. However, there was no corresponding "netting" on Schedule J or the Means Test of Debtor's largest business related expense: transportation. Clearly, there are some additional business related expenses that could be considered under the "totality of the circumstances", but those amounts do not appear to be sufficient to offset the understatement of Debtor's income.

While simple math would show a large amount of income available to pay creditors - as much as $2,000 a month - the UST did not present testimony regarding the changes in the Debtor's income tax rates based upon: 1) the loss of a mortgage deduction; and 2) whether the deduction for taxes on the Means Test was based on income at a much higher level than listed on the Means Test.

Based upon Debtor's historic gross income listed on Exhibit 2, and the Debtor's reasonable and necessary expenses, and taking into account the variations in Debtor's income, and an increase in the amount that would need to be paid for income taxes, it still appears that about $500 a month would be available to pay creditors based upon what the court finds to be the best evidence available: Debtor's pre-petition local income, and her expenses as outlined above.

Over the life of a 60 month Chapter 13 case, a $500 a month payment would result in a total payment into the Plan of $30,000. This is well in excess of the statutory amounts Congress listed in 11 U.S.C. Section 707(b)(2)(A)(i). *See*, *In re James*, 414 B.R. 901, 915 (Bankr.S.D.Ga.2008) ("the abuse threshold fixed in §707(b)(2)(A) is a helpful tool for determining whether a case should be dismissed for abuse under §707(b)(3)(B).... We should pay close attention to the standard, but not become slave to it.").

Accordingly, the Debtor's income being greater than her necessary and reasonable expenses in an amount sufficient to allow her to fund a Chapter 13 Plan that would result in a substantial payment distribution to creditors, the court finds that, based on the facts in this case, the UST has met its burden of demonstrating that allowing this case to proceed under Chapter 7 would be an abuse under Section 707(b)(3).

**THEREFORE**, based on all of the foregoing reasons and authorities, good cause appearing,

**IT IS ORDERED** that the United States Trustee's Motion to Dismiss [Doc. #19] under Section 707(b)(1) based upon the presumption of abuse arising under Section 707(b)(2) is Denied.

**IT IS FURTHER ORDERED** that Debtor is allowed thirty (30) days from the date of this Order to file a motion to convert to a Chapter 13 case, absent which the United States Trustee's

motion to dismiss under Section 707(b)(3) [Doc. # 19] will be Granted, and this case will be dismissed, by separate order of the court.

# # # #